Susan FERNANDES

v.

Leonard LIMMER et al.

No. CA3–77–417–F.

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 30, 1979.

Barry A. Fisher, Los Angeles, Cal., John F. Jordan, Dallas, Tex., for plaintiff.

Charles C. Wells, C. Merrill Bierfeld, Lee Holt, S. G. Johndroe Jr., Dallas/Fort Worth Airport, Tex., John F. Boyle, Jr., Hutchinson, Price & Boyle, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

ROBERT W. PORTER, District Judge.

Plaintiff is a member of the International Society of Krishna Consciousness, a non-profit religious society, which requires its devotees to perform a religious ritual called Sankirtan, consisting in part of efforts to spread the religion's truths through the dissemination of religious tracts and solicitation of contributions. Defendant James Lilly is the Grapevine Police Chief; Defendant Leonard Limmer is the Dallas-Fort Worth Regional Airport Security Chief; and Defendant John Boyle is the Grapevine City Attorney.

Plaintiff seeks to enjoin Defendants' enforcement of a resolution passed by the Dallas Fort Worth Airport Board, and adopted as an ordinance by the cities of Dallas, Fort Worth, and Grapevine which regulates the solicitation of charitable contributions at the Dallas/Fort Worth Regional Airport (D/FW).[1] Plaintiff claims that the ordinance is facially unconstitutional, in violation of the First Amendment.

The parties have submitted this case to the Court on stipulated facts for decision, after the court earlier ruled on the Constitutionality of a similar previous ordinance, see *ISKON v. Dallas-Fort Worth Regional Airport Board,* 391 F.Supp. 606 (N.D.Tex. 1975), and the Board and cities revised the ordinance discussed in my 1975 decision. I have concluded that a permanent injunction restraining the Defendants from enforcing this ordinance/resolution is proper, for the reasons stated below.

*Jurisdiction*

An independent ground of jurisdiction is expressly required by statute in petitions seeking declaratory judgment, and the Declaratory Judgment Act was not intended to be used as a contrivance to create jurisdiction which does not otherwise exist. 28 U.S.C. § 2201; *Commercial Metals Co. v. Balfour, Guthrie, and Co. Ltd.,* 577 F.2d 264 (5th Cir. 1978). Jurisdiction, if present, must be based upon 42 U.S.C. § 1983 or 28 U.S.C. § 1331.

Defendants claim that Plaintiff, by suing the persons charged with enforcement of the ordinance, are impermissibly attempting to circumvent federal law which excludes cities and municipalities from suit under 42 U.S.C. § 1983, citing *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). The Supreme Court has held contrary to the Defendants' position in *City of Charlotte v. Firefighters,* 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976), permitting respondents in that case to sue individual members of the City Council under 42 U.S.C. § 1983 when it was not proper to sue the City itself. *Lynch v. Household Finance Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). Also, the Supreme Court now permits local government bodies to be sued directly under § 1983 for monetary, declaratory or injunctive relief where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers. *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This case falls squarely within the parameters set by

---

1. A copy of the Airport Board resolution, which was adopted by the cities (City of Dallas Ordinance No. 15369, City of Fort Worth Ordinance No. 7460 and City of Grapevine Ordinance No. 77–3) is attached in Appendix A. A more detailed description of Krishna activities can be found in *ISKON v. Rochford,* 425 F.Supp. 734 (N.D.Ill.1977); *ISKON v. Englehart,* 425 F.Supp. 176 (W.D.Mo.1977).

the Supreme Court in *Monell* and jurisdiction would also be proper under that decision.

■ Another basis for jurisdiction is the reasoning of *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Bivens* held that persons whose Fourth Amendment rights had been violated by federal agents may invoke federal question jurisdiction under 28 U.S.C. § 1331(a) and recover damages. It recognized a federal cause of action for constitutional violations in the absence of a federal statutory cause of action.

Although the Supreme Court has not yet decided whether *Bivens* can be extended to actions against municipalities, *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977), the Fifth Circuit has extended *Bivens* to fourteenth amendment actions against municipalities. *Reeves v. City of Jackson, Miss.,* 532 F.2d 491 (5th Cir. 1976); *Stapp v. Avoyelles Parish School Board,* 545 F.2d 527, 531 (5th Cir. 1977); *United Farmworkers of Florida Housing Project Inc. v. City of Delray Beach Florida,* 493 F.2d 799, 811 (5th Cir. 1974); *Traylor v. City of Amarillo, Texas,* 492 F.2d 1156, 1157 n. 2 (5th Cir. 1974); *Roane v. Callisburg Independent School District,* 511 F.2d 633, 635 n. 1 (5th Cir. 1975). Other circuits have also approved this extension: *Owen v. City of Independence, Missouri,* 560 F.2d 925 (8th Cir. 1977); *Amen v. City of Dearborn,* 532 F.2d 554 (6th Cir. 1976); *Brault v. Town of Milton,* 527 F.2d 730 (2nd Cir. 1975) rev'd on other grounds, *id.* at 736 (2nd Cir. 1975) (*en banc*); *Cox v. Stanton,* 529 F.2d 47 (4th Cir. 1975); *Hostrop v. Board of Junior College District No. 515,* 523 F.2d 569 (7th Cir. 1975), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); *Construction Industry Association v. City of Petaluma,* 522 F.2d 897 (9th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976). A suit against the airport would be in the nature of a suit against a municipality, and a suit against city and airport personnel might be construed as actually a suit against the municipality.

The Fifth Circuit has held repeatedly that a direct constitutional cause of action may be asserted under 28 U.S.C. § 1331 to vindicate First and Fourteenth Amendment rights. *Goss v. San Jacinto Junior College,* 588 F.2d 96 (5th Cir. 1979); *Stapp v. Avoyelles Parish School Board,* 545 F.2d 527, 531 n. 7 (5th Cir. 1977); *Reeves v. City of Jackson, Miss.,* 532 F.2d 491, 495 (5th Cir. 1976); *Hander v. San Jacinto Junior College,* 522 F.2d 204, 205 (5th Cir. 1975); *Roane v. Callisburg Independent,* 511 F.2d 633, 635 n. 1 (5th Cir. 1975).

The Municipal Airports Act, V.A.C.S. art. 46d–1 et seq. confers sovereign immunity upon municipalities with respect to the operation of municipal airports by expressly declaring them to be public and governmental functions. See V.A.C.S. art. 46d–15 and *Tompkins v. City of El Paso,* 449 F.2d 842 (5th Cir. 1971). This immunity does not apply in a *Bivens* context because: (1) the Supremacy Clause (Article VI cl. 2) of the U. S. Constitution mandates that no local immunity can shield a municipality for liability for Constitutional violations, *Owen v. City of Independence, Missouri,* 560 F.2d 925 (8th Cir. 1977); *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 478 F.2d 938 (1973), *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973) (federal, not state, law determines defense of immunity); *Williams v. Brown,* 398 F.Supp. 155 (N.D.Ill.1975); *Sanabria v. Village of Monticello,* 424 F.Supp. 402 (S.D.N.Y.1976), and (2) if federal law on immunity is to be extrapolated from 42 U.S.C. § 1983, then municipalities are not immune from suit. *Monell v. City of New York Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). I therefore conclude that jurisdiction in this case is also proper under a *Bivens* action involving alleged violations of the First and Fourteenth Amendments.[2]

---

2. The Defendants have requested a ruling on two other motions to dismiss, and to the extent that I have not commented on these in other parts of the opinion, I make the following rulings: (1) the motion of the Defendants to Dismiss Plaintiff's action for lack of jurisdiction

*Standing*

■ Defendants contend that plaintiff has no standing to challenge the DFW ordinance raising the issue of literature distribution because that distribution is usually done in the course of soliciting a contribution, and also because Plaintiff alleges only the threat of harassment and intimidation, rather than a specific illegal act committed by the Defendants.

The Supreme Court has held that solicitation of donations and contributions incidental to the main objective of preaching and propagating the doctrines of a religion is a constitutionally protected activity, *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Jamison v. Texas,* 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); see *ISKON v. Collins,* 452 F.Supp. 1007 (S.D.Tex.1977). In *Murdock,* the Supreme Court emphasized that the First Amendment protection is in no way diluted by the "commercial" aspects of the solicitation:

> "The mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise. If it did, then the passing of a collection plate in church would make the church service a commercial project . . . It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge. It is plain that religious organizations need funds to remain a going concern . . . Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way." 319 U.S. at 111, 63 S.Ct. at 874.

There is no evidence in this record which suggests that Plaintiff's *dominant purpose*

is the solicitation of funds; therefore, I reject Defendants' argument that soliciting contributions jurisdictionally taints the concurrent exercise of free speech rights.

The Supreme Court has also held that federal injunctive relief may be proper if there exists the threat of arrest which would be processed through the State courts, and no criminal proceedings are in fact pending in state court. *Doran v. Salem Inn,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) precludes federal suit when a state criminal action based upon the same nucleus of operative facts is pending. Plaintiff has standing whether or not the conduct could be proscribed by a properly drawn ordinance and whether or not Plaintiff ever applied for a permit. *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

The parties have stipulated that although the Airport Board's Resolution and corresponding ordinances passed by the cities have been in effect for a long period of time, no attempt has been made to enforce these laws due to the pendency of the original suit and an agreement executed between the parties December 21, 1975 and letter agreement dated February 1, 1977. *Younger* is therefore inapplicable. Clearly if these agreements were not in force, Plaintiff and other members of the Krishna sect could and would be prosecuted if they violated the ordinance, and counsel for Defendants so represented to the court when the court held oral argument in chambers. Plaintiff has standing in this action.[3]

over the subject matter is hereby overruled; and (2) the motion of the Defendants to Dismiss Plaintiff's action for failure to state a claim is hereby overruled.

3. The exception for commercial speech protection under the First Amendment, see, e. g. *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), "all but passed from the scene . . ." in 1975. *Virginia Board of Pharmacy v. Virginia Consumer Council,* 425

U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). There are some differences in the amount of protection afforded commercial speech but as the Krishna's dominant purpose, as evidenced from this record, is not solicitation of funds (although it is clearly a substantial purpose), these differences are not material in this case. *Virginia Pharmacy,* id., 425 U.S. at 771 n.24, 96 S.Ct. 1817.

*Indispensable Parties*

■ Defendants cite *ISKON v. New York Port Authority*, 425 F.Supp. 681 (S.D. N.Y.1977), arguing that all of the airline tenants who use the Dallas Fort Worth Regional Airport should be joined as indispensable parties to this litigation in order to effectuate complete relief. Fed.R.Civ.Pro. 19. In the *Port Authority* case, the New York Port Authority had a consistent policy of permitting unrestricted ISKON tract distribution and contribution in all public areas of the New York airport terminals (JFK, La Guardia, Newark) within which the Port Authority believed it had the power to grant such permission. The Port Authority contended that it lost the power to grant this permission once it leased the space to tenants. The court held that the airline leasees should be joined because: (1) joinder of the airlines would not affect the issue of subject matter jurisdiction, (2) a determination that the Port Authority had the power to regulate the licensing of First Amendment activities in leased areas would substantially affect the rights of the airlines under their lease agreements and, (3) the relief sought by Plaintiffs would require a determination that areas leased to airline tenants were First Amendment forums, if the court found that the Port Authority did not have authority over the airlines' leased areas.

The broad relief requested by the Plaintiffs in *Port Authority* and which was the basis of Judge Carter's decision to join the airline lessees in the suit, is materially different from the relief requested in this case. Solely attacked in this case is the facial unconstitutionality of Resolution 76–128 of the DFW Airport Board, and which was approved by the cities of Dallas, Fort Worth and Grapevine. Second, the Airport Board has entered into stipulations with ISKON (See Stipulation of Facts (SOF) # 3, and SOF Ex. # 1, 2), and has never contended that the Board lacked power to enter into these stipulations or that other parties were required as signators. The court also entered an order on February 7, 1978 permitting any airline licensee to file petitions in intervention. No petitions were filed. A letter response from the airlines, which I am including in the record, was received by the court on February 10, 1978 indicating that the airlines did not wish to intervene. Since my ruling will be restricted to the facial unconstitutionality of the Resolution and ordinances, and will not involve a determination of the lease rights, my decision should not affect the airline lessees or their lease rights.

*Amount in Controversy*

■ Defendants have urged that this case does not involve $10,000 in controversy. A $10,000 amount in controversy is not a requirement under 28 U.S.C. § 1343(3) & (4) for alleged violations of first amendment civil rights under 42 U.S.C. § 1983. *Douglas v. City of Jeannette, Pa.*, 130 F.2d 652 (3rd Cir. 1942), aff'd 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

For a *Bivens* action, a $10,000 jurisdictional requirement is imposed under 28 U.S.C. § 1331. The courts have consistently held that the denial of First Amendment rights inflicts irreparable injury, notwithstanding the availability of alternative forums. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 160–161, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Dombrowski v. Pfister*, 380 U.S. 479, 489, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *Freedman v. Maryland*, 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Quantity of Copies of Brooks v. Kansas*, 378 U.S. 205, 244–245, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); *Quaker Action Group v. Hickel*, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969). Even a day's delay of First Amendment freedoms causes irreparable injury, *Quaker Action Group, supra.*

. . . (T)he other option—violating the law to exercise one's constitutional rights and awaiting the sure hand of the law—itself may cause, as it is alleged to cause, irreparable injury both economic (in the form of loss of revenue because customers are fewer and increase in costs

due to the difficulty of finding employees willing to risk arrest, prosecution and possible imprisonment) and personal (the freedom to exercise first amendment rights without genuine fear of prosecution). Where other plaintiffs have faced the similar situation of being required to forego constitutionally protected activity in order to avoid arrest, the Supreme Court has found irreparable injury (citations omitted).

*414 Theater Corp. v. Murphy,* 499 F.2d 1155 (2nd Cir. 1974).

The Constitution does not preserve only those rights which can be accurately measured by the dollar; it also preserves those rights which are priceless. I find that Plaintiff has properly asserted the $10,000 jurisdictional amount in controversy for a *Bivens* action under the First Amendment.

### The Resolution/Ordinance

Neither the cities nor the Airport Board may completely bar the distribution of literature containing religious or political ideas in *public places*. In public places the cities or the Airport Board may impose regulations reasonably related to the public interest, convenience and necessity of the time, place and manner of first amendment activities, *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1939), and any attempted regulation of the dissemination of ideas in public places must be carefully drawn so that it does not abridge the Constitutional guarantees of freedom of speech and religion. *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1945); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Defendants urge that the airport is private property and therefore the cities and the Airport Board may substantially regulate the distribution (or "sale", as the Defendants' term it) of Krishna religious literature.

The resolution/ordinance regulates the distribution of political, labor-management, and charitable literature and solicitation of funds on the Airport grounds, requiring the purchase of a permit. Permits for charitable solicitation, charitable literature distribution, or a combination of the two, and political advertisements or labor-management disputes are restricted to the sidewalks of the Airport and Terminal Building "but shall never be permitted inside any terminal building or in any other Airport structure." Resolution # 76–128 § 4A (h). Thus there are two distinct geographic areas regulated by the resolution/ordinance: outside the terminal, and inside the terminal. The preliminary question narrows to whether any or all of the geographic area regulated in the resolution/ordinance at D/FW Airport is a "public" forum.

### Outside D/FW Terminal

In my earlier opinion, I reviewed three public forum cases, *Marsh v. Alabama, supra, CAMP v. Chicago,* 508 F.2d 921 (7th Cir. 1975), and *Kuszynski v. City of Oakland,* 479 F.2d 1130 (9th Cir. 1973), and concluded:

(1) D/FW is analogous to a company town, and "the cities will be hard pressed . . . to justify banning the Plaintiffs completely from the entire 18,000 acre area";

(2) the *CAMP* decision holding O'Hare Airport was a public forum was limited geographically to within the terminal buildings and did not include the "fingers" leading to the arrival and departure gates, leaving a question as to whether those areas were also public forums; and

(3) *Kuszynski,* while holding that an airport is a public forum, did not indicate whether all portions of an airport were public forums although the ordinance apparently forbade distribution of literature only in certain (unspecified in the opinion) areas of the airport and regulated the manner of distribution in other (also unspecified) areas.

Recent cases have generally not analyzed whether certain portions of an airport could, in fact, be private areas, or whether the airport itself could be a legitimate private area, but have concluded that airports

are public forums without extensive analysis. *ISKON v. Collins,* 452 F.Supp. 1007 (S.D.Tex.1977); *ISKON v. Englehart,* 425 F.Supp. 176 (W.D.Mo.1977) (portions of airport open to public are public forums); *ISKON v. Rochford,* 425 F.Supp. 734 (N.D.Ill. 1977); *ISKON v. Griffin,* 437 F.Supp. 666 (W.D.Pa.1977); *ISKON v. Eaves,* (N.D.Geo. 1976) (unpublished) (little difference between airport and public street as protected forum); *ISKON v. Lamb,* (D.C.Nev.1975) (unpublished) (McCarran International Airport is public forum); *ISKON v. Wetzel,* (D.C.Ariz.1975) (unpublished) (publicly owned airport is public forum); *ISKON v. Lentini,* (E.D.La.1975) (unpublished letter opinion).

A more detailed analysis was made by the court in *ISKON v. Adlum,* (W.D.Wash.1978) (unpublished) but the court did not adequately relate its conclusion that areas available to the public were first amendment forums with its earlier detailed findings of fact describing various areas of the airport. In *ISKON v. Wolke,* (E.D.Wis. 1978) (unpublished) the court relied heavily on *Logan Valley* (discussed below), a decision of the Supreme Court that was overruled, a 1968 Second Circuit case whose reasoning may be outdated by subsequent Supreme Court decisions, and *ISKON* cases cited above which ignore the fundamental issues, and merely draw the conclusion that airports are public forums without discussing any basis for the decision.

Defendants rely on *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) where Justice Stewart, writing the majority opinion, concluded that shopping centers are *not* First Amendment forums, and that *Amalgamated Food Employees Union v. Logan Valley,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), which held to the contrary, was overruled by *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). In *Lloyd* the Supreme Court apparently conceded that shopping centers have sidewalks, streets, and parking areas which are functionally similar to those found in municipalities, but concluded that these did not make a shopping center functionally equivalent to a mu-

nicipality. Even though Lloyd's private police were given full police power by the city of Portland, and Lloyd's was very intertwined with streets, the court in *Hudgens* sided with Justice Black's dissent in *Logan Valley* where he noted that the shopping center in that case contained no homes, sewage disposal plant, or post office, all attributes of municipalities and company towns, both acknowledged first amendment forums. *Marsh v. Alabama, supra.*

Entrance to D/FW Airport, which has a completely fenced perimeter, is through two toll plazas, one at the north and one at the south entrance, which feed cars onto a road which bisects the complex. Money is charged for the use of the roadway, and airport parking facilities. Ground transportation carriers cannot operate within the airport without the express written permission of the Airport Board. Access to the airport is not limited to those persons intending to travel on an airline. The airport complex includes a hotel, a bank, gas stations, bars, 14 restaurants, newsstands, gift shops, tobacco shops, toy shops, parking lots, and AIRTRANS surface transportation within the airport complex; all of these facilities are available to the general public. The Airport maintains its own security force; over 14,000 people work at the airport. The concession areas in the airport and the terminal buildings are leased to the airlines.

D/FW thus embraces many features of the *Marsh* company town and of the *Lloyd* shopping center, although clearly D/FW is not a shopping center itself. D/FW has one element not found in either *Lloyd, Logan Valley,* or *Hudgens,* cases which all involved *privately* owned areas which appeared to have primarily a public function. D/FW, although leased in part to tenants, is owned in fee simple by the City of Dallas and the City of Fort Worth, a *publicly* owned area.

In *Marsh* the Supreme Court downplayed ownership when it found a privately owned company town was a first amendment public forum. The Court stretched that princi-

ple in *Logan Valley* to transform a privately owned shopping center into a public forum for expression, and then retreated from that determination in *Lloyd* and *Hudgens.* Perhaps a privately owned airport could be analagous to the private shopping centers in *Lloyd* and *Hudgens.* Here, however, public ownership combined with the company town activities which occur at the airport, clearly indicate that D/FW airport, at least those parts which are not leased to others, is a public forum. *Marsh v. Alabama, supra; Kuszynski v. City of Oakland, supra.*[4]

### In-Terminal Prohibition

The Defendants vigorously defend the right of D/FW, through the resolution/ordinance, to deny the Plaintiff and other members of the Krishna sect, access to the inside of the Terminal buildings for distribution of literature and solicitation of contributions. Although the Airport Board has leases for the Terminal Buildings with the airlines, those leases are not in themselves determinative in resolving what constitutes a public forum, *Marsh v. Alabama, supra*; they are one factor in determining the character of a place. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

The Airport Board apparently maintains enough control over the inside of the Terminal Buildings to prohibit the solicitation of charitable contributions in those areas and enforce that prohibition (Appendix A) and negotiate interim provisions for in-terminal solicitation during the pendency of this lawsuit. (SOF Ex. # 1, 2). The activities within the buildings, described above, are analagous to those in a company town or bus station. Some parts of the inside terminals are probably private (for example, the areas restricted to flight personnel);

other areas may or may not be public forums (for example, the American Airlines main departure lounge, or the Braniff individual departure seating areas); but clearly there are portions of the terminal (for example, the public corridors and entrance halls to the airport terminal buildings) that are public forums. In those areas the public is not a captive audience (as they may be in the departure lounge areas), nor is access otherwise restricted for safety or security reasons (as it presumably is in the flight personnel areas).

I conclude that at least part of the airport terminal buildings are public forums, and therefore the portion of the resolution and ordinances that prohibits solicitation within the terminal buildings is facially unconstitutional as overbroad, and Defendants are enjoined from enforcing this total prohibition. *Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

### Freedman Safeguards

■ Regulations which vest a public official with the authority to grant, deny, and revoke permission to exercise First Amendment rights must provide four procedural safeguards: (1) the licensor must grant or deny the permit in the briefest specified time frame possible; (2) if the permission as sought is denied or revoked, the ordinance or regulation must require a licensor to institute within a specified brief time a proceeding for temporary, preliminary and permanent injunction to restrain the proposed expression asserted to be constitutionally protected, and assume the burden of proof in such judicial proceedings; (3)

---

4. The character of the airport and the pattern of usual activity make the airport an appropriate place for communication of views. It is one of the busiest airport terminals in the United States. The crowds outside the terminal buildings are not captive audiences, but can move freely from place to place. See *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir. 1968) (bus terminal is public forum). True, the

principal purpose of the airport is to move people from one place to another via airplane; but the court must look beyond "principal" purposes to determine whether or not an area is a "public" forum. "Streets" are primarily designed to assist the movement of traffic and people, but they are proper First Amendment forums. *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

any restraint imposed in advance of a final judicial determination on the merits must be limited to preservation of the status quo for the shortest fixed period; and (4) it must assure a prompt final judicial decision. *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

Defendants suggest that *Freedman* is applicable solely to licensing laws where the literature to be disseminated must be approved, and not where the approval is as to the background and intentions of the applicant. This position is inconsistent with the Supreme Court's concern for substantive and procedural due process safeguards where one must first pass before a licensor before being allowed to express First Amendment rights. The Court in *Freedman,* a censorship case, noted that a censorship proceeding puts the initial burden on the exhibitor or distributor. The censor may well be less responsive than a court to the interests of free expression and if the decision is delayed, the censor's determination may in fact be final. These concerns prompted the Court to require the four procedural safeguards. *Freedman, supra.* The same concerns are evident when the resolution/ordinance may indirectly regulate speech content by regulating who may speak. The procedural requirements set out in *Freedman* are applicable to licensing laws, including the resolution/ordinance in this case, where the licensor regulates approval of who may exercise First Amendment expression by inquiry into the background and intentions of the applicant.

■ This conclusion is consistent with cases following *Freedman* which have applied the *Freedman* safeguards to other systems of prior restraint. See *United States v. Thirty-seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1970) (system by which federal customs agents seize imported materials); *Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) (system by which postal officials restrict use of mails); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (permit to conduct march on public streets). Therefore the

resolution/ordinances are constitutionally defective on their face because they fail to provide *Freedman* safeguards, specifically:

(a) the application must be made three days in advance but there is no specific brief time requirement as to when it must be acted upon, § 4A(b);

(b) if the permit is denied or revoked, there is an appeal procedure without any specific brief time limitations, § 4A(j), and no *court* appeal is provided; and

(c) if judicial review of the denial or revocation of a permit is initiated by the director, there is no requirement in the regulation assuring the prompt conclusion of that review.

*Overbreadth and Vagueness*

■ Rules restricting the exercise of First Amendment activities to prior approval are inherently suspect and bear a heavy presumption against their constitutional validity. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Bantam Books v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1968). The standards set forth must be "susceptible of objective measurement", *Keyish v. Board of Regents,* 385 U.S. 589, 603–604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and "precision of regulation must be the touchstone." *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1962). "Invariably, the Court has felt obliged to condemn systems in which the exercise of such authority was not bounded by precise and clear standards." *Southeastern Promotions, supra,* at 95 S.Ct. 1244. Plaintiff attacks 5 provisions of the Dallas/Fort Worth Airport ordinance as unconstitutionally overbroad or vague.

*"Fraudulent transaction" § 4A(c)(2)*

■ This section provides that a permit is denied if the licensor views the applicant "as presently or previously engaged in a fraudulent transaction or enterprise." § 4A(c)(2) (See Appendix A). *Cantwell v. Connecticut, supra,* presented the Court with a licensing law that permitted a public

> this wrong! Southeastern Promotions is the "Hair" case

official to determine if a religious solicitation campaign was fraudulent or of a bona fide religious nature. The Supreme Court invalidated the licensing law because the licensor had been given discretion to make judgmental assessment of facts.

"Nothing we have said is intended to even remotely imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct." *Cantwell v. Connecticut, supra,* 310 U.S. at 306, 60 S.Ct. at 904.

The Court conceded in *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) that fraudulent appeals may be made in the name of religion, but concluded:

"A municipality cannot, for this reason, require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a discretion to the police to say some ideas may, while others may not, be carried to the homes of citizens; some persons may, while others may not, disseminate information from house to house. Frauds may be denounced as offenses and punished by law. Trespass may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not impower a municipality to abridge freedom of speech and press." *Schneider* at 164, 60 S.Ct. at 152.

I find that the provision is unconstitutionally vague and impermissible. As the Supreme Court noted, there are other means, e. g. penal laws, to prevent the perpetration of a fraud on the public (or, in Texas, there is the Texas Deceptive Trade Practices Act which might apply civil penalties).

*"Public security, health, safety" § 4A(c)(4)*

█ A permit can be denied if the licensor decides he has "good reason to believe" the permit will result in "hazard to the public security, health, safety or welfare". § 4A(c)(4) (See Appendix A). Numerous Supreme Court cases have held similar vague standards unconstitutional, where a public official is left to decide if he deems granting or denying a permit would be dangerous or hazardous to the public interests. The standard of "good reason to believe" gives the public official in this case virtually unlimited discretion to deny a permit— the regulation becomes a license to rationalize good reasons. See *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1948) ("public welfare and morals"); *Largent v. Texas,* 318 U.S. 418, 63 S.Ct. 667, 87 L.Ed. 873 (1943) ("proper and advisable"); *Shuttlesworth v. Birmingham, supra,* ("public welfare, peace, safety, health"). These criteria are unconstitutionally vague.

*"Interfere, impede, obstruct" § 4A(h)(4) (hh); § 4A(c)(5); § 4A(h)(4)(ii); § 4A (c)(5)*

█ A licensor may cancel a permit or deny renewal if it is his judgment that the permittee has "interfere(d) with the free passage of, or access of" other persons; "ever obstructed any entrance or exit to solicit donations or distribute literature" (§ 4A(h)(4)(hh); § 4A(c)(5); or "impede(d) the flow of pedestrian traffic" (§ 4A(h)(4)(ii); § 4A(c)(5). "Obstruct" and "impede" are again terms that permit the enforcer of the regulation unbridled discretion in determining when to cancel or deny renewal of a permit; they are unconstitutionally vague, as is the term "interfere". In *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) the Court invalidated a similar ordinance (similar in that it used similar vague terminology) that criminalized those who "interfered" with a business. The Court held that the term "interfere" was overbroad because it could "be proved merely by showing that others react in a way normally expectable of some upon learning the facts of a dispute." *Thornhill, supra,* at 60 S.Ct. 743. A similar criticism can be made of the terms used in this resolution/ordinance and I find them unconstitutionally broad and vague.

*Excessive Costs § 4A(c)(3) & Emergency Situation § 4A(h)(4)(gg)*

A permit may be refused if the licensor determines that the "expected cost of solicitation will be excessive in relation to the gross amount to be collected." § 4A(c)(3). The licensor is empowered to immediately cancel a permit, and close the Airport to First Amendment expression regulated by the resolution/ordinance, while leaving it open to the general public, if he deems that there exists "any emergency situation, unusually congested conditions in the areas of the permit caused by the severe weather, schedule interruptions or for security measures." § 4A(h)(4)(gg).

■ It probably would not be unreasonable to prohibit certain First Amendment expression during "emergency" situations but there is no justification for the present restriction (§ 4A(h)(4)(gg)) in this record, and when first amendment freedoms are involved, the Defendants bear a heavy burden that they must meet to justify the restrictions. Therefore, I find that Defendants have not met this burden at this time with regard to this particular restriction, and it is therefore unconstitutional on its face.

■ When costs exceed 25% of the amount collected, the cost of solicitation is deemed "unreasonable" and therefore presumably "excessive," although that presumption may be rebutted by a showing of good cause. To enforce this provision, the resolution/ordinance permits examination of all accounting and bookkeeping records, tax records, etc. of a charity for audit.

Defendants contend that a similar provision passed Constitutional muster in *National Foundation v. City of Fort Worth*, 415 F.2d 41 (5th Cir. 1969), when the Fifth Circuit upheld a 20% limitation with a similar "good cause" provision.

The Fifth Circuit, however, never addressed the question of whether or not such financial disclosure invaded the traditional separation of church and state because the National Foundation was not a religious organization. The Circuit held that the

Foundation, not religious organizations, had no right to solicit funds for charity without state regulation. The Circuit's holding was thus limited to the non-religious Foundation and this case presents a different factual setting.

Moreover, the District Court rejected the other constitutional arguments presented by the Foundation by holding that "there is no constitutional right to make public solicitation of funds for charity" (a holding apparently upheld by the Circuit), and *Virginia Board of Pharmacy* and *Bates* have made that view of "commercial speech" incorrect. *National Foundation v. City of Fort Worth*, 307 F.Supp. 177 (N.D.Tex.1967).

Recent Supreme Court cases decided after *National Foundation* clearly indicate that this type of financial inquiry into the use. of church funds is not constitutionally permissible. In *Lemon v. Kurtzman*, 403 U.S. 602, 620, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971) the Court observed:

"The program requires the government to examine the school's records in order to determine how much of the total expenditures is attributable to secular education and how much to religious activity. This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids . . . We cannot ignore here the danger that pervasive modern governmental power will ultimately intrude on religion and thus conflict with the Religion Clauses".

No church or political party should be compelled to bear itself of its membership lists and explain the source and use of each dollar without a showing of compelling need achievable by no adequate alternative. Unless such a need is shown for disclosure, not established in this record, the potential for chilling effect on donors, members, and those who associate with the Society and deal with it financially is great, as is the impact of the churches' privacy. The rights of association and financial privacy are too great to be easily brushed aside. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d

659 (1976); *Kusper v. Pontikes,* 414 U.S. 51, 57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1974); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Bates v. Little Rock,* 361 U.S. 516, 522–23, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Button,* 371 U.S. 415, 431, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960).

These provisions for financial disclosure, etc. are thus unconstitutional on their face.[5]

 Finally, the ordinance/resolution levies a $6 per day fee for each permit, § 4A(f). In *Murdock v. Pennsylvania,* 319 U.S. at 112–113, 63 S.Ct. 870 (1943) the Supreme Court held that the payment of a $1.50 per day fee as a precondition for obtaining the permission of the government to solicit and exercise one's right of free speech was unconstitutional.

It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the privilege of delivering a sermon. The tax imposed by the City of Jeannette is a flat license tax, the payment of which is a condition of the exercise of these constitutional privileges . . .

It is contended, however, that the fact that the license tax can suppress or control this activity is unimportant if it does not do so. But that is to disregard the nature of this tax. It is a license tax—a flat tax imposed on the exercise of a privilege granted by the Bill of Rights. A state may not impose a charge for the enjoyment of a right guaranteed by the federal constitution . . .

As the court noted in *Hull v. Petrillo,* 439 F.2d 1184, 1186 (2nd Cir. 1971):

The ability to pay is not a legitimate criterion for the state to employ in deter-

mining who is to express his views on its streets and who is not. Therefore any fee imposed as a prerequisite to the exercise of the right to communicate ideas on the public sidewalk is an unconstitutional prior restraint upon the freedom of expression.

Therefore the $6 per day charge is also unconstitutional.[6]

Many people believe that the Krishnas are unjustifiably harassing airline travelers at the Dallas-Fort Worth Airport. The Krishnas express views currently not shared by many Americans, and their repeated efforts to convince us to follow the path of Krishna may be irritating and unpleasant. I can understand, therefore, why it may be difficult to accept my ruling, unless there is a clear understanding of the purpose of the First Amendment in the Bill of Rights.

The founders of this nation also expressed unpopular views and practiced religions that offended many Englishmen. These early Americans suffered religious persecution, jail, and death to establish the freedom to speak what they believed. The framers of the Constitution remembered this oppression when they wrote the Bill of Rights and placed their faith in a system of government by which everyone could freely express their ideas, no matter how unpopular those ideas might be at the time. Recognizing that there are many ways to seek the Truth and the Spirit, they also recognized that a man does not need a flock of followers to express a good idea.

In my original opinion in this case on preliminary injunction *ISKON v. Dallas-Fort Worth Regional Airport Board,* 391 F.Supp. 606 (N.D.Tex.1975), I stated at page 610: "It has been the Court's observation, however, that First Amendment

---

**5.** Any spending ceiling imposed upon a religious organization carrying on a religious solicitation is, per se, violative of the First Amendment. See *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) where the Court struck down restrictions on the amount of money a person or group could spend on political communication.

**6.** The Plaintiffs attack other features of the resolution/ordinance which I will not comment upon at this time; at a minimum the resolution/ordinance, as written, will have to be. redrafted to include the *Freedman* safeguards and eliminate the objectionable portions referred to in this opinion if the cities and Airport Board insist upon regulating this type of activity at the Airport.

rights, such as those of speech and religion, most often are raised by those who, like the Krishnas, are in the minority and are viewed by the majority as unpopular, if not downright unsavory." I expand on it today only to say that the American people must recognize and appreciate that the Framers of the Constitution adopted the Bill of Rights, including and most importantly the right to freedom of speech, to protect the individual against the majority. Thus, contrary to what many Americans mistakenly feel, the majority does not rule the Bill of Rights. In so stating, I can rely, among others, on Winston Churchill who, in commenting on the American Constitutional Republic, stated in substance . . . "it is a very bad system, save and except all others".

I will defer any determination of attorneys fees for at least 90 days until I can hold a hearing and consider evidence on the factors found in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974). During that 90 day period the parties should attempt to reach an agreement on an ordinance/resolution that will meet the requirements of the Constitution.

The parties to this suit should report on the progress toward this goal 30 days from the entry of this order.

Enforcement of City of Dallas Ordinance No. 15369, City of Fort Worth Ordinance No. 7460, City of Grapevine Ordinance No. 77–3, and Airport Board Resolution No. 76–128 by the Defendants is hereby permanently enjoined.

In closing, I am reminded of an old Navy axiom which, refined for publication, would read: "Paint it, hit it or salute it". Accordingly, today I paint the ordinance/resolution overbroad, I hit it with a tag of facial unconstitutionality, salute the First Amendment, and hereby enjoin its enforcement as hereinabove outlined.

It is so ORDERED.

## APPENDIX A

### RESOLUTION NO. 76–128

A Resolution by the Dallas-Fort Worth Regional Airport Board amending Resolution No. 71–172, entitled "The Code of Rules and Regulations of the Dallas-Fort Worth Regional Airport Board" by adding Section 4A. to Chapter Three thereof, to be entitled "Standards for Fund Solicitation Control and Control of Literature Distribution"; Defining Terms; Providing the conditions and standards under which Permits may be granted to, or denied, Applicants for charitable and other fund solicitations on the Airport; Providing the conditions and standards under which Permits may be granted to Applicants for the distribution of Literature on the Airport, in connection with a charitable solicitation; Providing the conditions and standards under which Permits may be granted to Applicants in connection with political campaigns and Labor-Management Disputes; Providing for fees to be charged for issuance of such Permits and for the cancellation of outstanding Permits; Providing for the regulation of the time, location, manner and number of persons who solicit funds under the Permit authority; Providing for Appeals from Permit denials; Providing a Penalty, a Severability and Savings Clause, and declaring an effective date.

---

WHEREAS, it is the desire and purpose of the Dallas-Fort Worth Regional Airport Board to more effectively control Charitable Fund Solicitation and Literature Distribution on Airport premises, and to protect the travelling public as well as persons desiring to solicit for charities, to balance the legal rights of each group, and to protect the public health, security, safety and general welfare;

NOW, THEREFORE, BE IT RESOLVED BY THE DALLAS–FORT WORTH REGIONAL AIRPORT BOARD:

SECTION 1. That the Code of Rules and Regulations of the Dallas-Fort Worth Regional Airport Board, adopted by Resolution No. 71–172, is hereby amended by adding to Chapter Three thereof, entitled "Personal Conduct," a section numbered 4A., to

be entitled "Standards for Fund Solicitation Control and Control of Literature Distribution," such Section to read as follows:

"SECTION 4A. STANDARDS FOR FUND SOLICITATION CONTROL AND CONTROL OF LITERATURE DISTRIBUTION:

(a) *DEFINITIONS:*

(1) "Charitable Organization" is defined as any person, firm, group, partnership, corporation or association whose avowed purpose and object is to benefit, assist, aid and further the following causes:

(aa) philanthropy;

(bb) assistance to persons who are poor, impoverished, destitute, underprivileged, needy, diseased, injured, crippled, disabled, handicapped, or in need of physical or mental rehabilitation;

(cc) churches, religious societies or other religious sects, groups or orders espousing spiritual and altruistic motives or conduct;

(dd) the teaching of patriotism, or promoting relief and assistance to this nation's war veterans;

(ee) beneficial education of the mind or assistance to educational institutions; or

(ff) the protection, shelter and sustenance of animals.

(2) "Charitable Solicitation" is defined as seeking money donations, pledges thereof, or anything of value to benefit, assist, aid and further the cause of a charitable organization, either orally or by literature distribution.

(3) "Literature" is defined as books, pamphlets, handbills, tracts, cards, circulars, pictures, films, magazines, or any other written or printed material.

(b) *PERMITS:* It shall be unlawful for a Charitable Organization to solicit funds on the Airport premises without first applying for and obtaining a Permit on forms prescribed by the Executive Director or his representative. The Application shall be submitted to the designated representative of the Executive Director at least three (3) days in advance of the first day sought for solicitation, and shall state:

(1) The full name and mailing address of the person or organization sponsoring, conducting or promoting the fund drive; if the mailing address is a Post Office Box Number, the actual street address shall also be stated;

(2) Whether or not the Applicant is a branch or division of a national organization, and if so the name thereof, and the mailing and street address of same;

(3) If the Applicant is a Texas corporation, a copy of its corporate Charter, as amended, shall be furnished; if it is a foreign corporation, a copy of its Authorization Certificate to do business in the State of Texas shall accompany the Application;

(4) The purpose or object of the Charitable Solicitation;

(5) The date or dates and hours of the solicitation;

(6) The number of persons to participate in the solicitation and the true legal name and address of each;

(7) Such other pertinent information found to be necessary by the designated official to adequately enforce the terms of this Resolution.

(c) *REASONS FOR REFUSAL OF PERMIT:* The Application shall be granted and the Permit shall issue unless one or more of the following facts is found to exist:

(1) that one or more of the statements in the Application is not true;

(2) that the Applicant or any agent or representative of the Applicant who will participate under the Permit is presently or has been engaged in a fraudulent transaction or enterprise, or has been convicted of a felony or other criminal offense involving moral turpitude;

(3) that the expected cost of solicitation will be excessive in relation to the gross amount to be collected. Any such cost of solicitation in excess of twenty-five (25%) percent of the total amount collected shall be considered and presumed to be unreasonable, but this presumption may be rebutted by Applicant upon good cause shown. Cost of solicita-

tion shall include any money or thing of value not reserved specifically and entirely to assist, aid or further the announced charitable cause. All accounting and bookkeeping records, government reports, all tax records for the preceding two years, and any other relevant papers or documents with reference to the Charitable Solicitation may be examined and audited either at the time of application, during the solicitation, or at or after the expiration of the Permit;

(4) when there is good reason to believe that the granting of the Permit will result in a direct and immediate danger or hazard to the public security, health, safety or welfare;

(5) when the Applicant or any agent or representative of the Applicant who will participate under the Permit has previously violated any portion of the Code of Rules and Regulations of the Dallas-Fort Worth Regional Airport Board, or has violated any of the terms and provisions of any prior Permit.

(d) *PERMITS FOR CHARITABLE LITERATURE DISTRIBUTION:* It shall be unlawful for a Charitable Organization to distribute Literature or any other article on the Airport in connection with a Charitable Solicitation without first applying for and obtaining a Permit on forms prescribed by the Executive Director or his representative. Action on such Applications and Permits shall be governed by Paragraphs (b) and (c) set forth above for Charitable Solicitation. Permits for distribution of Literature which espouses a charitable cause, where no solicitation for, and no acceptance of, money or anything of monetary value, is involved, shall be governed by Paragraphs (b) and (c) set forth above, except subparagraph (c)(3).

(e) *PERMITS FOR POLITICAL OR LABOR–MANAGEMENT LITERATURE DISTRIBUTION:* It shall be unlawful for a person to distribute Literature on the Airport whether or not there is solicitation or acceptance of money or anything of monetary value therefor, which is distributed in connection with the campaign of a political candidate or political issue, or in connection with a labor-management dispute, without first applying for and obtaining a Permit on forms prescribed by the Executive Director or his representative. Action on such Applications and Permits shall be governed by Paragraphs (b) and (c) set forth above, except subparagraph (c)(3).

(f) *FEES:* A fee of $6.00 per day for each day granted in any Permit referred to herein shall be charged and collected in advance to defray a part of the costs of Board employees' time spent in investigation, Permit preparation and subsequent supervision.

(g) *CANCELLATION OF PERMITS:* Any Permit granted hereunder may be cancelled after issuance if any of the above reasons for prior refusal should be discovered, or become apparent during the solicitation period.

(h) *TIME, LOCATION, MANNER AND NUMBER OF PERSONS INVOLVED:* When Permits for Charitable Solicitation, Charitable Literature Distribution, a combination of the two, or for political advertisement or labor-management disputes are granted, the following rules and standards shall apply:

(1) Location: Such Permits shall be restricted to the sidewalks of the Airport and the sidewalks of the Terminal Buildings on both levels thereof, but shall never be permitted inside any Terminal Building or in any other Airport structure.

(2) Time: Permits shall be issued for no more than a total of eight (8) days in any one calendar month, but the days need not be consecutive. Permit holders shall be restricted to the hours of 9:00 o'clock A.M. to 6:00 o'clock P.M. on the days of operation.

(3) Number of Persons: Not more than two (2) persons representing any one group or organization shall be permitted on a specified area of the sidewalks of a Terminal Building at one time, and no more than a total of four (4) persons from that group shall be permitted at one Terminal Building.

**(4) Manner of Operation:**

(aa) Each person included in a Permit shall be issued, and shall wear, a badge, nameplate, card or other personal identification on the upper clothing and in a manner clearly visible to the public. Such identification shall state the true and correct legal name of the solicitor and the organization or cause represented. It shall not be transferred to another person and must be returned to the issuing Airport official at the expiration of the Permit.

(bb) No Permittee shall make loud noises or create any other disturbances. No dancing, chanting, use of drums, cymbals, other musical instruments, or noise-making devices shall be permitted.

(cc) Permittees at all times are subject to all laws: Federal, State or Local, regarding fraud, assault, battery, theft, littering, picketing and all other laws relating to the conduct of persons in public places.

(dd) Permittees, when soliciting donations in connection with the distribution of Literature or the distribution of other articles, shall inform the person approached by them that a donation is solicited prior to the time such material is delivered to the prospective donor and such solicitor shall make the proper money change when informed of the amount being donated.

(ee) No Permittee shall erect or place a table, bench, chair, or other structure on any sidewalk or other premises of the Airport.

(ff) No Permittee shall distribute candy, gum or other food snacks or any food product, and shall not pin, tie, or attach any flower or other symbol, insignia or article on the clothing, luggage or vehicle of passengers or other persons at the Airport.

(gg) The Official who issues the Permit may cancel same due to any emergency situation, unusually congested conditions in the areas of the Permit caused by severe weather, schedule interruptions, or for security measures. At Permittee's option, a temporary reassignment of location may be utilized outside the location of the emergency condition, but not inside any Terminal Building or other Airport structure.

(hh) No Permittee shall interfere with the free passage of, or access of, other persons along sidewalks or at any entrances to or exits from a Terminal or any other structure; specifically, no Permittee shall ever obstruct any entrance or exit to solicit donations or distribute Literature or other articles.

(ii) No Permittee shall enter any stairwell, staircase, elevator, or escalator vestibule for solicitation or distribution purposes and shall not impede the flow of pedestrian traffic to sidewalk baggage collection or baggage loading areas. No person shall be impeded or approached while loading or unloading baggage from any public or private vehicle.

(jj) No Permittee shall operate in the roadways adjoining the Terminal sidewalks, nor in any other manner impede vehicular traffic in any roadway.

(kk) All Literature distributed by a Permittee which may be discarded by recipients shall be retrieved and the solicitation area cleared and cleaned of same daily.

(i) *APPEALS:* When an Application for a Permit hereunder is refused, for any one or more of the reasons herein stated, the Airport Official shall state the reason or reasons for such refusal in writing and deliver a copy to the Applicant. The Applicant may appeal such refusal to the Chairman of the Dallas-Fort Worth Regional Airport Board, who shall either hear and decide such appeal, or who may at his discretion appoint one or more Board members to hear and pass upon such appeal. If such appeal is overruled, no other administrative remedy shall be appropriate, and the Appellate process shall be considered administratively exhausted.

(j) *SEVERABILITY AND SAVINGS CLAUSE:* The sections, paragraphs, sen-

tences, clauses and phrases of this Resolution are severable, and if any phrase, clause, sentence, paragraph or section of this Resolution shall be declared unconstitutional by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality shall not affect any of the remaining phrases, clauses, sentences, paragraphs and sections of this Resolution, since the same would have been enacted without the incorporation in this Resolution of any such unconstitutional phrase, clause, sentence, paragraph or section. Further, the passage of this Resolution shall in no manner affect any other provisions of the Code of Rules and Regulations of the Dallas-Fort Worth Regional Airport Board, and all such other provisions shall remain in full force and effect.

(k) *PENALTY:* The violation of any provision of this Resolution where an act or a failure to act is made unlawful or is otherwise prohibited, shall be punishable by a fine not to exceed Two Hundred Dollars ($200.00), and each day a violation shall continue shall constitute a separate offense; provided, however, where the offense is one for which a penalty is fixed by state law, the latter penalty shall govern.

(*l*) *EFFECTIVE DATE:* This Resolution shall become effective upon approval by the City Councils of the Cities of Dallas and Fort Worth, and after publication of a substantive statement thereof and the penalty for violation thereof, in a newspaper of general circulation in each of the Counties of Dallas and Tarrant. Such notice shall state that a breach hereof will subject the violator to the infliction of a penalty and shall state that the full text of this Resolution is on file in the principal office of the Board, where the same may be read by any interested party.

PASSED, APPROVED AND ORDERED this 7th day of December, A.D. 1976.

(s) Henry Stewart
CHAIRMAN,
DALLAS–FORT WORTH RE-
GIONAL AIRPORT BOARD

ATTEST:

(s) Barbara Hollis

Staff Secretary
Dallas-Fort Worth Regional Airport Board

STATE OF TEXAS )(
)(
COUNTY OF DALLAS )(

I, Barbara Hollis, Staff Secretary of the Dallas-Fort Worth Regional Airport Board do hereby certify that the foregoing is a true and correct copy of Resolution No. 76–128 passed and approved by the Dallas-Fort Worth Regional Airport Board on December 7, 1976.

WITNESS MY HAND AND SEAL OF THE DALLAS–FORT WORTH REGIONAL AIRPORT BOARD this the 8th day of December, 1976.

(s) Barbara Hollis
Staff Secretary
Dallas-Fort Worth Regional
Airport Board

STATE OF TEXAS
COUNTY OF TARRANT
CITY OF GRAPEVINE

I, Shirley Armstrong, City Secretary in and for the City of Grapevine, Texas, DO HEREBY CERTIFY that the attached is a full, true and correct copy of ORDINANCE No. 77–3 passed by the City Council of said City on the 25th day of January, 1977, at 7:30 o'clock P.M.

WITNESS MY HAND AND SEAL OF SAID CITY on this the 27th day of January, 1977.

(s) Shirley Armstrong
CITY SECRETARY
CITY OF GRAPEVINE, TEXAS

SEAL