Susan FERNANDES, a/k/a Sanatani, on behalf of herself and all International Society for Krishna Consciousness members, residing in Dallas, Texas, Plaintiff-Appellee,

v.

Leonard LIMMER, Dallas-Ft. Worth Regional Airport Security Chief, et al., Defendants-Appellants.

No. 79–3581.

United States Court of Appeals, Fifth Circuit.*
Unit A

Dec. 11, 1981.

Rehearing and Rehearing En Banc Denied Jan. 27, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

620

Charles C. Wells, C. Merrill Bierfeld, Lee E. Holt, City Atty., Dallas, Tex., Arthur R. Petersen, City Atty., Fort Worth, Tex., for defendants-appellants.

Barry A. Fisher, David Grosz, Fisher and Moest, Los Angeles, Cal., John F. Jordan, Jordan, Rubin & Pace, Dallas, Tex., for plaintiff-appellee.

Before INGRAHAM, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This appeal presents yet another skirmish in the ongoing struggle between the followers of the Krishna religion and governmental entities intent on regulating the dissemination of literature and the solicitation of funds in public places.[1] At issue is the constitutionality of a local ordinance governing literature distribution and fund solicitation in the Dallas-Fort Worth Airport complex.[2] Ms. Fernandes, a Krishna devotee suing on behalf of the International Society for Krishna Consciousness (ISKCON) members,[3] brought this suit to enjoin enforcement of the ordinance. The district court determined that the ordinance trenched upon First Amendment rights and issued the requested injunction. We affirm.

## I. DESCRIPTION OF THE AIRPORT

The Dallas-Fort Worth Regional Airport (D/FW) has been judicially described before, *Continental Bus System, Inc. v. City of Dallas*, 386 F.Supp. 359 (N.D.Tex.1974), but this appeal necessitates a brief review of its configuration. The 18,000 acre D/FW complex sprawls across the borders of Grapevine, Euless, and Irving, municipalities lying between the cities of Dallas and Fort Worth, Texas. The airport is a major national air transportation center. It serves as a hub connecting regional air traf-

---

1. In recent years federal courts have addressed frequent challenges to governmental regulations restricting Krishna devotees from practicing Sankirtan, a religious ritual involving peripatetic fund solicitation and tract distribution in public places. *See, e. g.,* cases collected in *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

2. The relevant portions of the ordinance, formulated as a resolution by the Dallas-Fort Worth Regional Airport Board and adopted by the cities of Dallas, Fort Worth, and Grapevine, are contained in the Appendix.

3. In an explanatory footnote appended to its memorandum opinion by an order issued September 7, 1979, the district court noted that Ms. Fernandes never pursued a motion for

class certification. However, since the purported class sought no damages, a declaratory judgment and injunctive relief would be formulated identically whether the plaintiff sued individually or as a class representative. Therefore, the court deemed an inquiry into the propriety of a class action unnecessary.

Because the § 1988 attorneys' fees award was intended to compensate Ms. Fernandes' attorneys for their representation of ISKCON in the earlier, related suit challenging regulations in effect before the ordinance here at issue was enacted, and because Ms. Fernandes sued as ISKCON's representative, the complaining party in this case is interchangeably referred to as "Ms. Fernandes," "ISKCON," or "plaintiff."

fic as well as the departure point for air travelers in the Dallas-Fort Worth metropolitan area. The airport complex contains a hotel, a bank, and a variety of other commercial establishments in addition to air terminal facilities.

D/FW's four terminal buildings are crescent-shaped structures housing arrival and departure gates, airline ticketing and baggage operations, passenger waiting areas, bars, shops, and restaurants, as well as office facilities for the various airlines. Arrival and departure gates for air passengers radiate from central corridors running the length of each terminal building. The .terminal buildings are connected by a light rail shuttle system. Thus, while passengers initiating their flights at D/FW must enter the terminal buildings through exterior doors, it is possible for air travelers making a connecting flight at D/FW[4] to deplane and proceed to their departure gate in another terminal building without leaving the confines of the terminal system.

■ D/FW is jointly owned by the cities of Dallas and Fort Worth and operated by the Regional Airport Board. The Board, which employs a police force to maintain security in the airport complex, formulated the ordinance at issue in this appeal and is responsible for its administration and enforcement. Violations of the ordinance would be prosecuted through the municipal courts of Grapevine, Texas. Therefore, the plaintiff has selected the airport security chief and Grapevine law enforcement officials, all of whom are D/FW Board members, as named defendants in this declaratory judgment action to invalidate the ordinance. Her selection of defendants is appropriate. See International Society for Krishna Consciousness v. Eaves, 601 F.2d 809, 818–19 (5th Cir. 1979) (aspects of ISKCON suit challenging Atlanta airport regulations held justiciable when mounted against officials responsible for airport law enforcement).

This controversy first erupted in late 1974 when ISKCON members were arrested by D/FW police for soliciting funds, selling merchandise, and distributing literature in the terminal buildings without a permit in violation of airport regulations. ISKCON promptly sued to invalidate the regulations and enjoin their enforcement. The district court refused to issue a preliminary injunction, ISKCON v. Dallas-Fort Worth Regional Airport Board, 391 F.Supp. 606 (N.D.Tex. 1975), but dismissed the suit before ruling on the merits when the Board modified the regulations by enacting the ordinance at bar.

The Board's adoption of the modified ordinance prompted the filing of this law suit. Ms. Fernandes' complaint rests on the contention that the D/FW terminal buildings are public forums, where governmental restraints on the free exercise of speech and religious liberty must pass constitutional scrutiny. She challenges the ordinance on grounds of unconstitutional vagueness, overbreadth, prior restraint upon free speech, and infringement on free exercise of religious liberty.

The case was tried in the district court on testimony, stipulated facts, trial briefs, and documentary exhibits. In a memorandum opinion, 465 F.Supp. 493 (N.D.Tex.1979), the trial judge found for the plaintiff, invalidating the ordinance and enjoining its enforcement. The court further determined that under 42 U.S.C. § 1988 the plaintiff was entitled to attorneys' fees incurred in the successful litigation of this matter. Applying the Johnson v. Georgia Highway Express, Inc.[5] criteria, the court awarded attorneys' fees against the defendants in their official capacities. On appeal, the D/FW officials dispute the trial court's determinations on: (1) the status of the terminal buildings as public forums; (2) the merits of ISKCON's challenge to the facial constitutionality of the ordinance; (3) the necessi-

---

4. Although current data on the ratio of transfer passengers to passengers initiating or terminating flights at D/FW was unavailable at the time this case was orally argued, correspondence between the parties on the Record indi-cates that 55 percent of D/FW passenger traffic transfers at the airport.

5. 488 F.2d 714 (5th Cir. 1974).

ty of joining the airport's lessees as indispensable parties; and (4) the attorneys' fees award. We review these arguments individually.

## II. JUSTICIABILITY AND STANDING

Before proceeding to the defendants' argument over the characterization of the airport as a public forum and to ISKCON's constitutional challenge on the merits, we are obliged to identify the justiciable issues presented in this case. Our task is complicated by the anticipatory nature of this action for declaratory relief; no ISKCON permit application has been denied under the terms of the ordinance.

■ In *ISKCON v. Eaves*, 601 F.2d at 817–19, our Court gave detailed consideration as to whether there was an Article III controversy in a similar facial challenge to the Atlanta airport ordinance regulating ISKCON's activities. Noting the widespread judicial acceptance of anticipatory suits by active members of organizations with "goals apart from the extirpation of unconstitutional measures," *id.* at 819, Judge Goldberg, for the panel, determined that the Atlanta plaintiffs demonstrated the requisite concrete and definite interest in challenging the ordinance through threatened disobedience. Ms. Fernandes demonstrates that same degree of concrete adversity here.

■ Ms. Fernandes first challenges § 4A(c) of the ordinance which states the conditions under which a solicitation permit may be denied. Specifically, she alleges that this section constitutes a prior restraint upon First Amendment freedoms because of its lack of *Freedman*[6] procedural safeguards as well as its broad grant of discretion to the Executive Director in granting or denying a permit. Defendants argue that because plaintiff has neither applied for nor been refused a permit, she lacks standing to challenge this provision.

■■ Defendants' objection to standing is not supported in the law. It is clear that a party may challenge a licensing statute regardless of whether he or she was denied a permit, or whether one has ever been sought. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); *ISKCON v. Eaves*, 601 F.2d at 823. *See also Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). A court may invalidate an excessively broad grant of discretion on its face, without regard to the particular facts of the plaintiff's case, because the very existence of the discretion lodged in the public official is constitutionally unacceptable. *ISKCON v. Eaves*, 601 F.2d at 823.

■ Plaintiff has standing to support other challenges as well. She may assert an overbreadth challenge to § 4A(h)(1), which regulates the location in which solicitation is permitted, notwithstanding the fact she has not violated that section. *Broadrick v. Oklahoma*, 413 U.S. 601, 612–13, 93 S.Ct. 2908, 2915–2917, 37 L.Ed.2d 830 (1973). Likewise, plaintiff's grievance against the restraint on religious freedom imposed by the fee requirement in § 4A(f) is also justiciable although the case is in an anticipatory posture. *See Flast v. Cohen*, 392 U.S. 83, 104 n.25, 88 S.Ct. 1942, 1954 n.25, 20 L.Ed.2d 947 (1968). Plaintiff also has standing to mount vagueness challenges to §§ 4A(h)(4)(hh) and (ii) relating to obstructing entrances, stairways, and baggage areas, because she is entitled to fair warning as to what conduct the ordinance seeks to prohibit. *ISKCON v. Eaves*, 601 F.2d at 820–23.

---

**6.** *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). In *Freedman* the Supreme Court held that Maryland's motion picture censorship statute unconstitutionally infringed on the First Amendment rights of exhibitors because it lacked the following procedural safeguards: (1) a requirement that the state initiate judicial action to restrain exhibi- tion of the challenged film and bear the burden of proof in the judicial proceeding; (2) an assurance that the exhibitor will not be delayed from exhibiting the film while the state seeks protracted judicial review; and (3) a requirement that judicial review will be prompt. *Id.* at 59–60, 85 S.Ct. at 739–740.

■ Plaintiff's challenge to § 4A(h)(4) (gg), which governs the cancellation or reassignment of a permit already granted, evokes a different conclusion. In *ISKCON v. Eaves,* we held that a challenge to a similar provision was inappropriate because the possibility that the defects allegedly contained therein would affect an applicant who did not yet have a permit was merely contingent. 601 F.2d at 825. This contingency, coupled with the anticipatory posture of the entire proceeding, compels us to conclude that ISKCON's challenge to § 4A(h)(gg) is not at this time justiciable.

■ Counsel for the defendants asked at oral argument for detailed guidance in drafting constitutionally sound regulations in this delicate area. We appreciate counsel's quandary. Nevertheless, as an Article III court, our legislative impulses must be constrained by the scope of the controversy before us and a deferential respect for our limited judicial role. The foregoing features of the D/FW ordinance are the only matters properly before us on this appeal from ISKCON's anticipatory challenge.

### III. PUBLIC FORUM

We turn now to D/FW's claim that the airport ought not to be regarded as a public forum. It is now generally well established that airport terminals owned and administered by governmental entities are public forums in which efforts to regulate speech or religious activity must comport with First Amendment guarantees. *ISKCON v. Eaves, supra; ISKCON v. Rochford,* 585 F.2d 263 (7th Cir. 1978); *Chicago Area Military Project v. City of Chicago,* 508 F.2d 921 (7th Cir. 1975), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *Kuszynski v. City of Oakland,* 479 F.2d 1130 (9th Cir. 1973). Nevertheless, the defendants insist that the D/FW passenger terminals are not public forums. Defendants advance two arguments to support this contention. First, defendants state that the unique shape of the D/FW terminals renders the airport an inappropriate place for the expressive activities otherwise permitted in public forums. The terminals are narrow and crescent-shaped, crowded with thousands of travelers rushing to meet their flights. To allow solicitation within these passageways, argue defendants, would impede unduly the flow of the purposeful pedestrian traffic of the airport terminals.

■ While we accept D/FW's general description of the terminals, we cannot conclude that the interior of the terminals is not, at least partly, a public forum. To determine whether a particular place is a public forum we have held that inquiry involving the following factors is relevant:

does the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance[?]

*Southeastern Promotions Ltd. v. City of West Palm Beach,* 457 F.2d 1016, 1019 (5th Cir. 1972), quoting *Wolin v. Port Authority of New York,* 392 F.2d 83, 89 (2d Cir. 1968), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). Applying these criteria to D/FW, we find that the interior of the terminals contains areas which are public forums. That the passageways are crowded and narrow does not defeat this conclusion; rather, such factors go the reasonableness of the time, place, and manner restrictions imposed on persons exercising First Amendment rights in the forum. We sympathize with D/FW in its proper insistence on keeping terminal traffic free-flowing; however, this reason is not sufficiently compelling to justify the total exclusion of those wishing to exercise free speech and freedom of religion within the terminals.

■ Appellants also argue that even if D/FW's status as an airport makes it a public forum, the fact that it has leased every square foot to private air carriers takes it out of the public forum mold. This contention is not supported in the law.

■ The analogy posited by the defendants between the terminal buildings and shopping centers, where restrictions on the

exercise of free speech rights in privately-owned commercial enclaves have been approved, *see Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), is inapt. Despite the leaseholds of the air carriers, ownership of the airport remains in the municipal governments. Moreover, the existence of a leasehold by a private party on public property does not remove from the realm of state action restrictions on the exercise of civil rights at the site. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Derrington v. Plummer*, 240 F.2d 922 (5th Cir. 1956), *cert. denied*, 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (1957).

▮ Of course, we do not imply that governmental ownership of a facility guarantees the public absolute and unrestricted access for the purpose of exercising First Amendment liberties. *See Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (upholding ban on political campaigning in military enclave); *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (upholding application of trespass statute to bar demonstrations at a jail). Absent significant governmental interests justifying reasonable time, place, and manner restrictions, however, government-owned facilities generally must be made available for the exercise of First Amendment liberties. *Cox v. New Hampshire*, 312 U.S. 569, 575–76, 61 S.Ct. 762, 765–766, 85 L.Ed. 1049 (1941). As Justice Roberts observed in *Hague v. C. I. O.*, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939), the right to communicate in a public forum "may be regulated in the interests of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

▮ In finding the airport to be a public forum we do not hold that every area within the terminals is public. As the district court noted, 465 F.Supp. at 501, those parts of the terminals restricted to airline personnel are private, absent unusual circumstances. Likewise, the arrival and departure gates, where only ticketed passengers may go, are not public forums. The parallel between public streets and the crescent-shaped central concourses of the D/FW terminal buildings, where air travelers as well as the general public may shop, dine, imbibe, and sightsee, is clear and powerful, however. The analogy between these terminal concourses and public streets is further strengthened by the lack of restrictions on public access to the commercial establishments located along the crescent-shaped passageways, whether or not persons must pass through security check points first. It is true that ground access to the terminal buildings themselves is constrained by the toll gates at the fenced perimeter surrounding the airport complex, but as with other public facilities, this restriction does not preclude characterization of the terminal buildings as public forums[7] because *any* person who pays the toll may enter through these portals.

▮ In view of the lack of restrictions on entry by the general public, and the commercial, street-like character of the terminal concourses, we agree with the conclusion of the district court that the D/FW terminal buildings must be treated as public forums.

## IV. THE FACIAL CHALLENGE TO THE ORDINANCE

### A. THE PERMIT SYSTEM

▮ D/FW's content-neutral permit system has little in common with the classic prior restraint thought to be the inspiration for the First Amendment. *See Near v. Minnesota*, 283 U.S. 697, 713, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931) (discussing the

---

7. We note in passing that ground access to Manhattan Island is similarly restricted. We hardly think that bridge and tunnel toll booths take New York City's streets out of the realm of public forums.

reaction to the English licensing system restricting the publication of literature pending governmental review of its content). *See also* Emerson, *The Doctrine of Prior Restraint*, 20 J. LAW & CONTEMP. PROB. 648 (1955). Nevertheless, prior restraint doctrine has been invoked to strike down content-neutral permit systems that regulate protected First Amendment activities. *E. g., Shuttlesworth v. City of Birmingham, supra; Staub v. City of Baxley*, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). These cases teach that governmental authorities may not, except in demanding circumstances, deny access to a public forum in anticipation of consequences that may flow from the contemplated activity. Punishment for criminal behavior must be government's response to an abuse of the privilege to use a public forum; prospective restraints are unconstitutional.

### 1. Procedural safeguards

Ms. Fernandes charges that the permit system contained in §§ 4A(b) and (c) is unconstitutional because it lacks the procedural safeguards required by the Supreme Court in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The ordinance's lack of procedural safeguards assuring prompt judicial review of permit refusals presents a prior restraint problem. In *Freedman v. Maryland*, the Supreme Court prescribed standards for expedited judicial review governing a state motion picture licensing board's content-sensitive regulation of films. *See* n.5, *supra.* Although D/FW's regulatory ordinance purports to be content-neutral, the consequences flowing from a permit denial here are essentially the same as those addressed in *Freedman*: to an unsuccessful permit applicant, the unavoidable delay posed by judicial review is tantamount to an effective denial of First Amendment rights. Therefore, "[t]he *Freedman* principle is applicable here." *Shuttlesworth v. Birmingham*, 394 U.S. at 162, 89 S.Ct. at 944 (Har-

lan, J., concurring) (*Freedman* procedural safeguards apply to content-neutral municipal parade permit ordinance). *Accord, Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

The lack of these procedural protections in this licensing system means that the opportunity to exercise free speech and other associational rights can be postponed for substantial periods of time before adequate review. These deficiencies can be eliminated in an effective and functioning ordinance as the Atlanta case shows. *ISKCON v. Eaves, supra.*

One may construe §§ 4A(b) and (c) of the D/FW ordinance to mean that the Board will act upon permit applications within three days. The district court, however, correctly found that these provisions imposed no time limits on the Board's consideration of a permit application. 465 F.Supp. at 502. It is clear from the terms of the ordinance that a decision within three days is not compelled. And while § 4A(i) of the D/FW ordinance establishes an administrative appeal mechanism, the ordinance does not require: (1) the Board to institute prompt judicial proceedings in which it bears the burden of justifying its refusal to issue the requested permit; (2) assurance that any interim restraint imposed pending judicial resolution on the merits will be of brief duration; and (3) a guarantee of swift, final judicial action.

The Atlanta airport ordinance governing charitable solicitation and literature distribution recently reviewed by our Court incorporated the *Freedman* procedural safeguards. *See ISKCON v. Eaves*, 601 F.2d at 834–35 (Atlanta Airport Ordinance §§ 4, 4A). We agree with the district court's determination that the lack of these safeguards in the ordinance at bar renders D/FW's permit system constitutionally deficient.

### 2. Discretion in the Executive Director

Plaintiff also alleges that § 4A(c) is unconstitutional because of defects in the five

standards contained therein which are intended to guide the Executive Director of the airport in his determination of when permits should be denied. We address the constitutionality of these subsections individually.

### § 4A(c)(1)

Section 4A(c)(1) authorizes the denial of a permit if "one or more of the statements in the Application is not true." ISKCON argues that this section is unconstitutional because it conditions the granting of a permit on the content—truth or falsity—of the applicant's speech. ISKCON simply misconstrues this section. A permit may be denied for the falsity of statements *in the application*, not for the falsity of the ideas the applicant wishes to disseminate. Since gaining relevant information as to the applicant is proper, the falsification of such information is not constitutionally privileged.[8]

### § 4A(c)(2)

This section authorizes permit denial if the applicant or any person who will participate in the activities "is presently or has been engaged in a fraudulent transaction or enterprise, or has been convicted of a felony or other offense involving moral turpitude." ISKCON objects that by these words the Board has been vested with unlimited discretion to determine if the applicant's activities are or have been fraudulent. This provision sanctions the denial of a permit also on the basis of his or her past conduct. We deal with these issues separately.

#### (a) fraudulent transactions

While we recognize the Board's legitimate interest in preventing fraud, we cannot find this provision to be an appropriate manner for doing so. Under its terms, the Board is empowered to deny a permit based upon its opinion as to the legitimacy of the applicant's organization. The Di-

rector of the Board is given no guidance as to how such determinations are to be made. The unbridled discretion of a licensor in determining the legitimacy of an organization was condemned by the Supreme Court in *Cantwell v. Connecticut,* 310 U.S. at 307, 60 S.Ct. at 904, when it struck down an ordinance permitting a state official to grant or deny a solicitation license based on whether or not, in his opinion, the cause was religious. Although recognizing the possibility that fraudulent appeals could be made in the name of religion, the Court held in *Schneider v. State,* 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939), that "a municipality cannot, for this reason, require all who wish to disseminate ideas to present them first to [officials] for their consideration and approval...." There are other means, such as penal laws, to prevent and punish frauds without intruding on the First Amendment freedoms:

> Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated ... and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.

*Id.* at 164, 60 S.Ct. at 152. We conclude that this standard violates First Amendment freedoms.

#### (b) past convictions

This section authorizes the Board to deny an applicant total access to the airport grounds if he has been convicted of a felony or other offense involving moral turpitude. To sustain such a total abrogation of First Amendment rights, the government must show that the speech prohibited will "surely result in direct, immediate and irreparable damage...." *New York Times Co. v. United States,* 403 U.S. 713, 730, 91 S.Ct.

---

**8.** ISKCON states that if § 4A(b), which details the information an application must contain, is vague, an applicant cannot be denied a permit for answering falsely because it is impossible to know what information the application is supposed to contain. We do not find that any of the § 4A(b) requirements are vague, however.

2140, 2149, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring). That the applicant has been convicted of a crime in the past is not a sufficient reason for his blanket exclusion in the future. *See ISKCON v. Eaves,* 601 F.2d at 833, and our discussion of § 4A(c)(5) of this ordinance, *infra.*

It is true that persons convicted of crimes suffer collateral consequences for the rest of their lives. They may not hold public office, serve as jurors, or join the army. These exclusions, however, involve the employment of felons in sensitive areas of public importance. In *DeVeau v. Braisted,* 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960), the Supreme Court upheld a bi-state statute excluding felons from becoming officers of labor unions because of the voluminous concrete evidence proving the danger of allowing felons to control unions. "New York was not guessing or indulging in any assumptions that convicted felons constituted a deleterious influence on the waterfront. It was acting on impressive if mortifying evidence...." *Id.* at 159–60, 80 S.Ct. at 1154. D/FW has not shown any "impressive" evidence to sustain this provision; as far as the record shows, it is merely "indulging in assumptions." Persons with prior criminal records are not First Amendment outcasts. Thus, this provision of the ordinance is unconstitutional.

## § 4A(c)(3)

Section 4A(c)(3) authorizes denial of a permit to a "charitable organization"[9] if its "expected cost of solicitation will be excessive in relation to the gross amount to be collected." The subsection goes on to establish a presumption that solicitation costs totaling more than 25 percent of the gross receipts are excessive. To ensure compliance with this provision, D/FW auditors are empowered to scrutinize all financial records of permit holders and applicants.

In *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), the Supreme

Court invalidated as facially overbroad a local ordinance prohibiting door-to-door canvassing by charitable groups whose solicitation costs exceeded 25 percent of receipts. The Court acknowledged the legitimacy of the Village's interests in regulating fraudulent, dangerous, or annoying solicitation. *Id.* at 636–37, 100 S.Ct. at 836. Nevertheless, the Court struck down the ordinance's cost-effectiveness requirement on the ground that it was not sufficiently related to those legitimate aims so as to justify its infringement on the solicitor's First Amendment liberties. *Id.* at 636–38, 100 S.Ct. at 836–837.

D/FW seeks to distinguish its permit system from the Village of Schaumburg's by emphasizing that its cost-effectiveness standard is a rebuttable presumption akin to the provision upheld in *National Foundation v. Fort Worth,* 415 F.2d 41 (5th Cir. 1969), *cert. denied,* 396 U.S. 1040, 90 S.Ct. 688, 24 L.Ed.2d 684 (1970). *See Village of Schaumburg,* 444 U.S. at 635 n.9, 100 S.Ct. at 835 n.9. The ordinance in *National Foundation* specifically excluded religious groups such as the Krishnas from the cost-effectiveness requirement, however. In upholding the ordinance, this Court noted that "[a] fixed percentage limitation on the costs of solicitation might be undesirable and inapplicable if applied to all types of charitable organizations." 415 F.2d at 46.

The fact that the D/FW ordinance percentage limitation consists of a rebuttable presumption does not save it from constitutional deficiency in light of *Schaumburg.* The rebuttable nature of the presumption undoubtedly narrows the sweep of the ban on solicitation efforts that are extraordinarily costly in relation to their results. Yet, to pass constitutional muster, the cost-effectiveness requirement must make "a substantial enough contribution to some combination of important governmental ends to outweigh its restrictive effect on First Amendment freedoms." *ISKCON v. Eaves,* 601 F.2d at 829 (emphasis omitted).

---

**9.** Section 4A(a)(1) defines charitable organization to include religious societies, sects, groups, and orders.

We concede the legitimacy and the importance of D/FW's asserted objectives in promulgating this regulation. Nevertheless, we question the relation between these objectives and the cost-effectiveness standard prescribed in § 4A(c)(3). The realm of religious and charitable organizations, as Justice White noted in *Village of Schaumburg,* *supra,* includes groups whose unorthodox messages will inevitably yield less cost-effective solicitation results. May D/FW premise the simultaneous admission of, for example, evangelical Baptists and the exclusion of Krishna devotees on the results of their fund solicitation efforts? We think not.

It is relevant also to recognize that this provision of the ordinance subjects a religious organization which wishes to solicit to a complete financial audit. Conceivably it authorizes a national audit of the books of such organizations to enable an accurate 25 percent level evaluation. If a religious belief calls for proselytizing which returns only 70¢ or 50¢ or 30¢ on the dollar, as long as the action is in good faith in the belief that souls are being saved, how can society conclude that these activities are "excessive?" The First Amendment says we do not question such good faith religious commitments. *United States v. Ballard,* 332 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944).

■■■ While subsection 4A(c)(3) holds open the promise that unpopular religious minorities might gain access to the D/FW forum through administrative grace, it still imposes a cost-effectiveness evaluation on the free exercise rights of religious minorities which cannot be justified. Section 4A(c)(3)'s cost-effectiveness standard is not sufficiently tailored to serve D/FW's interests in protecting against fraudulent or annoying solicitation to justify the resulting imposition on First Amendment rights.[10]

### § 4A(c)(4)

■■■ This section authorizes the Executive Director to deny a permit "when there is good reason to believe that the granting of the permit will result in a direct and immediate danger or hazard to the public security, health, safety or welfare." ISKCON contends that this provision is unconstitutional because it gives the Executive Director excessive discretion in deciding whether the granting of the permit will be detrimental to the public interest.

In *Shuttlesworth v. City of Birmingham,* *supra,* the Supreme Court invalidated a municipal ordinance that empowered a public official to deny a parade permit if, in his opinion, the proposed parade would be detrimental to the "public welfare, peace, safety, health, decency, good order, morals or convenience." *Id.* 394 U.S. at 149, 89 S.Ct. at 938. The use of public streets cannot be conditioned upon an official's opinion as to the harmful consequences that might result. *Id.* at 153, 89 S.Ct. at 940. *Accord Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *Staub v. City of Baxley, supra.* Discretion in public officials must be narrowly circumscribed. "[A] municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to . . . parade according to their own opinions regarding the potential effect of the activity in question. . . ." *Shuttlesworth,* 394 U.S. at 153, 89 S.Ct. at 940.

We agree with the district court's conclusion that the standard of "good reason" is indefinite and does not comport with the constitutional requirement that discretion in public officials be specifically and narrowly circumscribed. A before-the-fact determination as to the harmful consequences of an applicant's speech is by this ordinance made a subjective judgment call in the total discretion of the Director. This type of unbridled discretion has been condemned time and time again by the Supreme Court.

---

**10.** In disposing of ISKCON's challenge to § 4A(c)(3) on overbreadth grounds, we need not reach the issues, decided by the trial court, of the provision's validity under the "excessive entanglement" prong of the Establishment Clause test announced in *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

A narrowly drawn statute authorizing the official to grant or deny a permit based on narrow criteria related to the proper regulation of public places would pass constitutional muster. *See, e. g., Cox v. New Hampshire, supra* (upholding permit system which sanctioned denial of permit if proposed activity would interfere with the public convenience to use the city streets). This provision is not so narrowly drawn. Accordingly, we find § 4A(c)(4) unconstitutional.

### § 4A(c)(5)

■ Subsection 4A(c)(5) authorizes permit denial on the ground that "the Applicant or any agent or representative of the Applicant ... has previously violated ... Regulations of the Dallas-Fort Worth Regional Airport Board, or has violated any of the terms and provisions of any prior Permit."

Denial of a permit for prior violations unquestionably entails a total abridgement of a citizen's right to use the forum provided at the D/FW airport. *Compare Kunz v. New York, supra* (denial of permit application for public worship based on disorders caused by prior worship meetings held by applicant constitutes improper censorship). The First Amendment restricts such abridgement unless the government can show that the speech prohibited will "surely result in direct, immediate, and irreparable damage...." *New York Times Co. v. United States*, 403 U.S. at 730, 91 S.Ct. at 2149 (Stewart, J., concurring). D/FW's attempt to meet this burden amounts to a refrain of the generalization this Court capsulized aptly: "once a sinner, always a sinner." *ISKCON v. Eaves*, 601 F.2d at 833. Our Circuit has twice in recent years rejected this prior misconduct justification for a permit denial. *Id.; Universal Amusement Co. v. Vance*, 587 F.2d 159, 65–66 (5th Cir. 1978) (en banc), *aff'd*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980). Today, we reject it a third time. Subsection 4A(c)(5) imposes an unconstitutional prior restraint.

### B. § 4A(f)'s $6.00 FEE REQUIREMENT

Under its permit system, the airport undertakes to exact a $6.00 daily fee from all permittees to be used in defraying the costs incurred by the Board in investigation and preparation of the permit and subsequent supervision. ISKCON contends that the fee constitutes a tax on their exercise of First Amendment freedoms.

■ Exaction of fees for the privilege of exercising First Amendment rights has been condemned by the Supreme Court. *See Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Jones v. City of Opelika*, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943); *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (tax on newspapers based on amount of circulation violates First Amendment). Were states permitted to tax First Amendment activities, the eventual result might be the total suppression of all those voices whose pockets are not so deep. "[F]reedom of speech ... [must be] available to all, not merely to those who can pay their own way." *Murdock v. Pennsylvania*, 319 U.S. 105, at 111, 63 S.Ct. 870, at 874, 87 L.Ed. 1292. *See also Carolina Action v. Pickard*, 465 F.Supp. 576, 580–81 (W.D.N.C.1979).

In *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), the Supreme Court reversed the convictions of eight Jehovah's Witnesses who were arrested for selling religious tracts door-to-door without a license in Jeanette, Pennsylvania. A Jeanette municipal ordinance required colporteurs to obtain a license from the city and pay $1.50 per day licensing fee. Justice Douglas, writing for the Court, characterized the $1.50 exaction as "a flat tax imposed on the exercise of a privilege granted by the Bill of Rights." 319 U.S. at 113, 63 S.Ct. at 875. Such a tax, the Court held, was an unconstitutional restriction on the free exercise of religious belief.

The district court, relying on *Murdock* and *Hull v. Petrillo*, 439 F.2d 1184 (2d Cir. 1971) (reversing the dismissal of a suit by Black Panther Party members challenging a municipal ordinance imposing a $15.00 per

year fee on newspaper street vendors), struck down § 4A(f)'s $6.00 per day permit application fee. On appeal, the defendants seeks to characterize the $6.00 fee as a permissible regulatory levy devoted to defraying the cost of the permit system, as opposed to a tax on First Amendment activity. *See, e. g., South Carolina Highway Dept. v. Barnwell Bros., Inc.*, 303 U.S. 177, 185–188, 58 S.Ct. 510, 513–515, 82 L.Ed. 734 (1938).

 A licensing fee to be used in defraying administrative costs is permissible, *Cox v. New Hampshire, supra,* but only to the extent that the fees are necessary. *Moffett v. Killian,* 360 F.Supp. 228, 231–32 (D.Conn.1973) (invalidating fee imposed for legislative lobbying when in excess of costs of administration); *NAACP v. City of Chester,* 253 F.Supp. 707 (E.D.Pa.1966) (invalidating $25.00 fee for use of a sound truck when defendant did not submit evidence justifying permit fee on the basis of administrative cost).

 We recognize that distinguishing a proper "cost of regulation fee" from an impermissible "flat license tax" is a slippery process. The parallels between the $6.00 D/FW permit fee and the *Murdock* tax, however, are extremely strong. The *Murdock* ordinance imposed an exaction, moderate in amount, on the privilege of using a public forum for constitutionally protected purposes and so does the D/FW ordinance. In *Murdock*, the governmental body did not demonstrate a link between the fee and the costs of the licensing process, nor has D/FW done so in this case.[11] *See NAACP v. City of Chester, supra.* The *Murdock* ordinance conditioned free exercise rights on a colporteur's willingness and ability to pay, and so does the D/FW ordinance. On the basis of the overwhelming similarities between this provision and the ill-fated licensing tax reviewed in *Murdock*, and the absence of a restriction on the uses of the fee for covering the costs of regulation, we

affirm the district court's holding that § 4A(f) is an unconstitutional limitation upon rights guaranteed by the free exercise clause.

## C. THE OVERBREADTH CHALLENGE TO § 4A(h)(1)

 ISKCON argues that D/FW's blanket prohibition of solicitation and distribution inside the terminal buildings is overbroad because it unduly restricts the First Amendment activity within a public forum. We agree.

 The federal courts may not strike down statutes as facially overbroad unless their defectiveness is substantial, "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. at 615, 93 S.Ct. at 2918. We find that § 4A(h)(1)'s defects are substantial. Governmental restrictions on the exercise of First Amendment freedoms in public forums must be limited in scope to reasonable time, place, and manner regulations. *Cox v. New Hampshire,* 312 U.S. at 575–76, 61 S.Ct. at 765–766. Such restrictions must be justified by "weighty reasons." *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). Carefully tailored restraints designed to further legitimate governmental interests in preserving the forum for the normal pattern of activities conducted there are constitutionally acceptable. An outright ban on the use of the forum for expressive purposes, on the other hand, can seldom, if ever, be justified. *Hague v. C. I. O.,* 307 U.S. at 516, 59 S.Ct. at 964.

By forbidding absolutely the exercise of speech and religious liberties within the terminal buildings, the D/FW ordinance sweeps substantially beyond the ambit of permissible regulation. *Cantwell v. Connecticut,* 310 U.S. at 304, 60 S.Ct. at 903. In so holding, we do not imply that the entire area within the terminal buildings is a public forum; preservation of the private char-

---

11. Of course, the anticipatory nature of this litigation has precluded D/FW from making such a showing. While its claim is superficially plausible, D/FW has not offered any support

for its contention that the $6.00 fee is needed to defray the costs of operating the permit system.

acter of certain terminal areas justifies restrictions as to those areas. *See* discussion in Part III, *supra.* Similarly, governmental interests in preserving D/FW's usefulness as an air passenger and baggage terminal can support regulations that assure the unimpeded flow of passengers and airline employees through the terminal buildings. D/FW's effort to exclude entirely Sankirtan practitioners from within the terminal buildings, however, is an unconstitutionally overbroad regulation.

The Airport Board argues that the recent Supreme Court case of *Heffron v. ISKCON,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), mandates a contrary conclusion. But this contention rests upon a misinterpretation of that case. *Heffron* concerned a challenge by ISKCON to a Minnesota Agricultural Society rule regulating the place and manner of distribution, sales, and solicitation at a state fair. The rule required that anyone desiring to sell, exhibit, or distribute materials must do so from booths which could be rented on a first come, first served basis. ISKCON did not challenge the booth allocation process or the rental fee; its sole complaint was that the requirement that such activities be conducted only at fixed locations unduly restricted its members' exercise of First Amendment rights in a public forum. As a justification for the restriction, the Society stressed the need to maintain the orderly movement of the patrons in a small, congested area.

The Court found that the Society's rule was a reasonable regulation narrowly tailored to serve a substantial state interest. In so holding, the Court stressed two factors. First, the "special attributes" of a fair, *i. e.,* its temporariness, large crowds, and small area, necessitated such regulations to prevent widespread disorder. *Id.,* 101 S.Ct. at 2565. Second, the rule did not deny complete access to the fairground and did provide ISKCON with reasonable and adequate means to sell and solicit on the fairground. *Id.* at 2565.

We find two crucial distinctions between *Heffron* and the case at bar. First, the "special attributes" of two differing forums make regulations that would be reasonable in one not necessarily reasonable in the other. The Minnesota fairground is "a limited public forum in that it exists to provide a means for a great number of exhibitors temporarily to present their products or views...." *Id.* at 2567. The fairground is "a relatively small area of 125 acres, the bulk of which is covered by permanent buildings, temporary structures, parking lots, and connecting thoroughfares," attracting crowds of 160,000 on weekends. *Id.* at 2565. The Minnesota Society's interest in efficient operation of the fair and crowd control is acute in this setting.

The airport, on the other hand, is not "limited" in the same ways. It is a permanent, on-going concern, and its directors are not subject to the same pressures as is the Society in formulating short-lived, expedient regulations to ensure order. The airport includes four large terminal buildings and serves 70,000 travelers each day. Certain areas of the terminals may be as crowded as the fairground in *Heffron;* however, the D/FW Board has not shown which, if any, areas are so congested. The regulation prohibiting access to the entire terminal area is overbroad to the extent that it covers areas in which the Board's interest in pedestrian traffic control has not been shown to be substantial. The record in this case, unlike the record in *Heffron,* does not justify this broad denial of access to the forum.

A second distinction between the two cases is that the Society, unlike the D/FW Board, did provide a reasonable means of access to the forum: the Minnesota Krishnas could have applied for a booth within the fairground. In their complaint, the Krishnas did not challenge the method of booth allocation or the fee charged to those who used booths. Their sole claim was that they should be permitted to carry on their activities freely anywhere within the fairground. In the present case, ISKCON does not assert an unqualified right to solicit and distribute literature anywhere inside the airport; it contests the complete denial of access to the forum. It does not suggest

that regulations within the terminals would be impermissible.

D/FW suggests that ISKCON does have access to the forum because it can obtain a permit to solicit and distribute literature on the sidewalks abutting the terminals. To support this contention, D/FW relies on the Court's conclusion in *Heffron* that the availability of rental booths within the fairground constitutes reasonable access to the forum. The reliance is sorely misplaced, however. First, ISKCON may not have access to even the sidewalks without first obtaining a permit through a process which we have determined is partially flawed. In *Heffron*, booths were rented on a first come, first served basis. Second, access to the sidewalks is far from a reasonable alternative for ISKCON. The record shows that more than half of the patrons of D/FW are transfer travelers who never come into contact with the sidewalks; they either transfer to gates within one terminal or transfer to another terminal by means of the light rail tram. In *Heffron*, the alternative of booth rental was reasonable because the booths were "located within the area of the fairgrounds where visitors are expected, and indeed encouraged, to pass." *Id.* at 2568 n.16.[12]

We conclude that the blanket prohibition of § 4A(h)(1) is unconstitutionally overbroad.

## D. VAGUENESS CHALLENGES TO §§ 4A(h)(4)(hh) and (ii)

ISKCON complains that certain provisions of the D/FW ordinance do not give fair warning of the conduct they purport to proscribe. In the words of the Supreme Court, a statute is unconstitutionally vague if persons "of common intelligence must necessarily guess at its meaning and differ as to its application. . . ." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Because this variety of statutory imprecision encourages self-censorship, *see Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 1322, 12 L.Ed.2d 377 (1964), it is vulnerable to facial attack. *ISKCON v. Eaves*, 601 F.2d at 820–23.

In a September 28, 1979 order, the district court revised its earlier published opinion in light of our Circuit's detailed consideration of related issues in *ISKCON v. Eaves*. Reversing its earlier stand, the district court determined that § 4A(h)(4)(hh)'s prohibition on "interfere[nce]" with or "obstruct[ion]" of people moving through the airport was not unconstitutionally overbroad. The trial court held, however, that "the phrase . . . referring to the impediment of the flow of pedestrian traffic (*i. e.,* § 4A(h)(4)(ii)) is still unconstitutionally vague. . . ."

We find that neither provision is facially invalid. In contrast to the Atlanta airport ordinance provision struck down for vagueness in *ISKCON v. Eaves,*—a prohibition on interference with the undefined "conduct of any authorized business at the airport"—D/FW ordinance subsections 4A(h)(4)(hh) and (ii) define clearly the activities they protect from interference by solicitors: pedestrian passage along sidewalks, through entrances and exists, to baggage collection and claims areas, and vehicle loading and unloading. Would-be solicitors receive fair warning of the conduct proscribed in subsections (hh) and (ii). "[W]e can never expect mathematical certainty from our language." *ISKCON v. Eaves,*

---

12. In its brief, D/FW asserts, without elaboration, that the availability of leased space within the terminals has never been questioned. If we assume that D/FW is offering leased space as an alternative form of access to the terminals, our conclusion is unchanged. We believe the prospect of leasing commercial space in an international airport is not a reasonable accommodation of First Amendment rights. The reasonableness of the booth rental fee in *Heffron* *in and of itself* was not contested by the Minne-

sota Krishnas. The availability of the booths as an *uncontested* alternative made the prohibition of activity other than in the booths a reasonable regulation. Because we cannot sustain even a $6.00 permit fee, *see* discussion in Part IV B *supra*, we certainly cannot conclude that the prospect of leasing commercial space within the terminal, which costs far more than $6.00, is a viable alternative that would make the prohibition of § 4A(h)(1) a reasonable regulation.

601 F.2d at 830, quoting *Grayned v. City of Rockford*, 408 U.S. at 110, 92 S.Ct. at 2300. The minimal ambiguity presented in §§ 4A(h)(4)(hh) & (ii) is well within constitutional limits and we find these provisions of the ordinance constitutional.

## V. INDISPENSABLE PARTIES

 Defendants attack the district court's refusal to dismiss the case for failure to join the airline lessees as indispensable parties under Fed.R.Civ.P. 19. In support of this attack, defendants cite the district court opinion in *ISKCON v. New York Port Authority*, 425 F.Supp. 681 (S.D.N.Y. 1977), in which ISKCON's challenge to the Port Authority's pamphleteering solicitation regulations was dismissed, in part, for failure to join the carriers with leasehold interests in the air terminal buildings. D/FW contends that because the airlines' rights as lessees will be affected substantially by the judgment their absence in this litigation is grounds for dismissal.

 Courts confronted with motions to dismiss a suit for failure to join purportedly "indispensable parties" properly approach the problem pragmatically. *Schutten v. Shell Oil Co.*, 421 F.2d 869, 874 (5th Cir. 1970). Where, as here, it is possible to resolve the dispute without adversely affecting the interests of the absent parties, the district court should not dismiss the case. *See Bourdieu v. Pacific Western Oil Co.*, 299 U.S. 65, 70, 57 S.Ct. 51, 53, 81 L.Ed. 42 (1936); 7 C. Wright & A. Miller, Fed. Practice and Procedure § 1602 at 22–23 & n.56 (1972).

The position of the airlines in this case is distinguishable from the airlines in *Port Authority*. Here, the D/FW Airport Board asserts its authority to impose and administer a regulatory permit system within the terminal areas under lease to the carriers. In fact, the leases governing the airlines' use of the premises contain a nonexclusivity clause through which the Board retains the right to authorize persons other than the airlines to use the premises. Furthermore, the airlines themselves do not believe that they will be affected by this litigation. The district court invited the airlines to join the litigation, but they refused the invitation. The airlines' decision, of course, is not dispositive of this issue; however, it strengthens our conclusion that their absence is not a fatal blow to jurisdiction.

D/FW has offered no other reason, *i. e.*, repercussions between itself and the lessees, on which this court might base a dismissal under Rule 19. The controversy between ISKCON and the Board over regulations which the Board has power to enforce within the D/FW terminal buildings may be adjudicated without impairing the carriers' leasehold rights. The district court's judgment did not adjudicate the *lessees'* rights to restrict the practice of Sankirtan in their departure lounges, shops, or restaurants; it merely adjudicated the *Board's* authority to do so under this particular ordinance. The district court did not err in proceeding to judgment without joining the airlines.

## VI. ATTORNEYS' FEES

Having determined that Ms. Fernandes prevailed on ISKCON's behalf in the § 1983 claim against the D/FW ordinance, the district court concluded that a § 1988 attorneys' fees award was appropriate. ISKCON's attorneys submitted fee requests totalling $35,000 and expense reimbursement requests of $3314.59. The court awarded $17,500 in fees and $1820.08 in expenses for services rendered in connection with this case from 1974—when ISKCON first sued to challenge the ordinance—through August of 1979. The award was made to run against the defendants in their official capacities.

On appeal, D/FW contests the award on three grounds. First, D/FW contends that ISKCON did not prevail in the "first suit," (*i. e.*, the motion for preliminary injunction decided at 391 F.Supp. 606 (N.D.Tex.1975)) and, hence, is not entitled to a § 1988 award. Second, D/FW maintains that the award reflects an improper abrogation of the legislative immunity to which the defendants are entitled under *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59

L.Ed.2d 401 (1979). Finally, D/FW insists that ISKCON waived its claim for attorneys' fees prior to February 1, 1977 by agreeing to "abandon all claims for money damages."

Section 1988 awards are reversible on appeal only for abuse of discretion. *Robinson v. Kimbrough*, 620 F.2d 468, 470 (5th Cir. 1980). To determine whether the district court abused its discretion, we must review carefully the basis upon which the court made its award. *Clanton v. Orleans Parish School Board*, 649 F.2d 1084 (5th Cir. 1981). D/FW's immunity and waiver defenses constitute legal questions which we must review as plenary matters. *See, e. g., Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980).

Turning first to D/FW's contention that the attorneys' fee award was erroneous because ISKCON did not prevail, we begin from the premise that interim setbacks on interlocutory motions or in settlement negotiations are immaterial to the ultimate issue. A party need not procure a judgment or settlement satisfying every claim he asserts in order to "prevail" under § 1988. *Brown v. Culpepper*, 559 F.2d 274, 275 (5th Cir. 1977). ISKCON's failure to obtain a preliminary injunction in 1975 and the terms of settlement offers it refused along the way are of no moment: the trial judge found that ISKCON substantially prevailed as a practical matter in vindicating the rights it first asserted in 1974. We cannot say that preliminary setbacks, be they defects on a motion for preliminary injunction or an agreed dismissal and refiling necessitated by D/FW's amendment of the ordinance, render erroneous the district court's conclusion that Fernandes "prevailed." Therefore, the § 1988 award predicated on this set of facts was not an abuse of discretion.

The Board members' immunity claim is equally unavailing. The defendants, as state officers, do not enjoy the Eleventh Amendment immunity reserved to the states. *Supreme Court of Virginia v. Consumers Union, supra; Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The legislative immunity afforded local, state, and federal legislators is likewise unavailable to protect the members of the D/FW Board because, although they are vested with rulemaking powers, they are subject to liability in this case for their actions as enforcement officers. *See Consumers Union*, 446 U.S. at 734–36, 100 S.Ct. at 1975–1977 (distinguishing between the Virginia Supreme Court's liability for legislative as opposed to enforcement activities). Furthermore, the legislative immunity discussed in *Lake Country Estates, supra*, on which defendants strongly rely, applies only to immunity from damage awards. Whether the D/FW Board members are immune from damage awards is irrelevant here because § 1988 attorneys' fee awards are an element of *costs*. Section 1988 itself, as well as the legislative history, S.Rep.No. 94–1011, 94th Cong., 2d Sess., at 5, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5908, 5913, specifically provide that an award of attorneys' fees is an element of costs, not damages. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Universal Amusement Co. v. Vance, supra.* Our recent case of *Hernandez v. City of Lafayette*, 649 F.2d 336 (5th Cir. 1981), is equally not pertinent as it dealt with the issue of whether *legislative* immunity from damage claims is applicable to local officials. Regardless of the legislative immunity which might be afforded the D/FW Board members, they are not immune from a § 1988 fee award in their official capacities as law enforcers.

The distinction between costs and damages is equally important in analyzing D/FW's waiver argument. D/FW asserts that ISKCON waived its claim to attorneys' fees by agreeing in 1977 to "abandon all claims for money damages."[13] The district

---

13. This purported waiver is contained in a letter from the parties to Judge Porter dated February 1, 1977. The letter sets forth the terms of an interim agreement providing ISKCON

court interpreted the language of the agreement to mean that "money damages" did not embrace a § 1988 attorneys' fee award, an element of *costs*. We agree with the court's interpretation as a matter of law. *See Hutto v. Finney*, 437 U.S. at 695–700, 98 S.Ct. at 2575–2579. The § 1988 award against the defendants in their official capacities is appropriate.

## VII. CONCLUSION

The decision of the district court with regard to all the provisions of the ordinance except § 4A(h)(4)(ii) warrants affirmance. We also uphold the constitutionality of § 4A(c)(1), an issue not considered by the district court. Plaintiff is entitled to attorneys' fees against the defendants in their official capacities in the amounts determined by the district court. The case is remanded to the district court so that appellees may file a motion requesting consideration of an additional award of attorney's fees for services rendered on this appeal. *Tasby v. Estes*, 651 F.2d 287 (5th Cir. 1981).

AFFIRMED in part, REVERSED in part, and REMANDED.

## APPENDIX

SECTION 4A. STANDARDS FOR FUND SOLICITATION CONTROL AND CONTROL OF LITERATURE DISTRIBUTION:

. . . .

(b) PERMITS: It shall be unlawful for a Charitable Organization to solicit funds on the Airport premises without first applying for and obtaining a Permit on forms prescribed by the Executive Director or his representative. The Application shall be submitted to the designated representative of the Executive Director at least three (3) days in advance of the first day sought for solicitation, and shall state:

(1) The full name and mailing address of the person or organization sponsoring, conducting or promoting the fund drive; if the mailing address is a Post Office Box Number, the actual street address shall also be stated;

(2) Whether or not the Applicant is a branch or division of a national organization, and if so the name thereof, and the mailing and street address of same;

(3) If the Applicant is a Texas corporation, a copy of its corporate Charter, as amended, shall be furnished; if it is a foreign corporation, a copy of its Authorization Certificate to do business in the State of Texas shall accompany the Application;

(4) The purpose or object of the Charitable Solicitation;

(5) The date or dates and hours of the solicitation;

(6) The number of persons to participate in the solicitation and the true legal name and address of each;

(7) Such other pertinent information found to be necessary by the designated official to adequately enforce the terms of this Resolution.

(c) REASONS FOR REFUSAL OF PERMIT: The Application shall be granted and the Permit shall issue unless one or more of the following facts is found to exist:

(1) that one or more of the statements in the Application is not true;

(2) that the Applicant or any agent or representative of the Applicant who will participate under the Permit is presently or has been engaged in a fraudulent transaction or enterprise, or has been convicted of a felony or other criminal offense involving moral turpitude;

(3) that the expected cost of solicitation will be excessive in relation to the gross amount to be collected. Any such cost of solicitation in excess of twenty-five (25%) percent of the total amount collected shall be considered and presumed to be unreasonable, but this presumption may be rebutted by Applicant

members with access to the airport under the newly revised ordinance pending adjudication of the civil rights claims raised in this lawsuit. The letter stipulates that "[t]his agreement in no way constitutes any accord or settlement of disputes, nor is it intended to be an abandonment or compromise of any claim or defense previously advanced by any party."

upon good cause shown. Cost of solicitation shall include any money or thing of value not reserved specifically and entirely to assist, aid or further the announced charitable cause. All accounting and bookkeeping records, government reports, all tax records for the preceding two years, and any other relevant papers or documents with reference to the Charitable Solicitation may be examined and audited either at the time of application, during the solicitation, or at or after the expiration of the Permit;

(4) when there is good reason to believe that the granting of the Permit will result in a direct and immediate danger or hazard to the public security, health, safety or welfare;

(5) when the Applicant or any agent or representative of the Applicant who will participate under the Permit has previously violated any portion of the Code of Rules and Regulations of the Dallas-Fort Worth Regional Airport Board, or has violated any of the terms and provisions of any prior Permit.

(d) PERMITS FOR CHARITABLE LITERATURE DISTRIBUTION: It shall be unlawful for a Charitable Organization to distribute Literature or any other article on the Airport in connection with a Charitable Solicitation without first applying for and obtaining a Permit on forms prescribed by the Executive Director or his representative. Action on such Applications and Permits shall be governed by Paragraphs (b) and (c) set forth above for Charitable Solicitation. Permits for distribution of Literature which espouses a charitable cause, where no solicitation for, and no acceptance of, money or anything of monetary value, is involved, shall be governed by Paragraphs (b) and (c) set forth above, except subparagraph (c)(3).

. . . .

(f) FEES: A fee of $6.00 per day for each day granted in any Permit referred to herein shall be charged and collected in advance to defray a part of the costs of Board employees' time spent in investigation, Permit preparation and subsequent supervision.

(g) CANCELLATION OF PERMITS: Any Permit granted hereunder may be cancelled after issuance if any of the above reasons for prior refusal should be discovered, or become apparent during the solicitation period.

(h) TIME, LOCATION, MANNER AND NUMBER OF PERSONS INVOLVED: When Permits for Charitable Solicitation, Charitable Literature Distribution, a combination of the two, or for political advertisement or labor-management disputes are granted, the following rules and standards shall apply:

(1) Location: Such Permits shall be restricted to the sidewalks of the Airport and the sidewalks of the Terminal Buildings on both levels thereof, but shall never be permitted inside any Terminal Building or in any other Airport structure.

. . . .

(4) Manner of Operation:

. . . .

(gg) The Official who issues the Permit may cancel same due to any emergency situation, unusually congested conditions in the areas of the Permit caused by severe weather, schedule interruptions, or for security measures. At Permittee's option, a temporary reassignment of location may be utilized outside the location of the emergency condition, but not inside any Terminal Building or other Airport structure.

(hh) No Permittee shall interfere with the free passage of, or access of, other persons along sidewalks or at any entrances to or exits from a Terminal or any other structure; specifically, no Permittee shall ever obstruct any entrance or exit to solicit donations or distribute Literature or other articles.

(ii) No Permittee shall enter any stairwell, staircase, elevator, or escalator vestibule for solicitation or distribution purposes and shall not impede the flow of pedestrian traffic to sidewalk baggage collection or baggage loading areas. No person shall be impeded or

approached while loading or unloading baggage from any public or private vehicle.

. . . .

(i) APPEALS: When an Application for a Permit hereunder is refused, for any one or more of the reasons herein stated, the Airport Official shall state the reason or reasons for such refusal in writing and deliver a copy to the Applicant. The Applicant may appeal such refusal to the Chairman of the Dallas-Fort Worth Regional Airport Board, who shall either hear and decide such appeal, or who may at his discretion appoint one or more Board members to hear and pass upon such appeal. If such appeal is overruled, no other administrative remedy shall be appropriate, and the Appellate process shall be considered administratively exhausted.